# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

_____

No. 2016-2288

_____

SYNQOR, INC.,

*Appellant*,

v.

VICOR CORPORATION,

*Appellee*.

_____

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in Reexamination No. 95/001,637

_____

## OPENING BRIEF OF APPELLANT

_____

THOMAS D. REIN
CONSTANTINE L. TRELA, JR.
RUSSELL E. CASS
BRYAN C. MULDER
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone:  (312) 853-7000
Fax:  (312) 853-7036
trein@sidley.com

*Counsel for Appellant SynQor, Inc.*

# CERTIFICATE OF INTEREST

Counsel for Appellant, SynQor, Inc., Thomas D. Rein, certifies the following:

1.      The full name of every party or amicus represented by me is:

SynQor, Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency and have not or will not enter an appearance in this case are:

Klarquist Sparkman LLP (Richard McLeod), and Greenblum & Bernstein, P.L.C. (Jill M. Browning, Arnold Turk, Gary V. Harcom, Bruce H. Stoner).

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST .............................................................i

STATEMENT OF RELATED CASES ................................................ vii

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES............................................................1

STATEMENT OF THE CASE................................................................2

I.     Introduction.............................................................................2

II.    Statement of Facts...................................................................5

       A.     DC-DC Converter Systems. ..........................................5

       B.     Prior Art DC-DC Converter Systems............................6

       C.     The Schlecht Inventions. ...............................................8

       D.     The '021 Patent. ..........................................................11

       E.     Earlier Proceedings Concerning the '021 Patent. ...............................15

              1.     The 497 Action...................................................16

              2.     The Murata Reexaminations. .............................17

              3.     The Vicor Reexaminations. ................................17

                     a)     Overview....................................................17

                     b)     The Vicor '021 Reexamination. ....................19

SUMMARY OF ARGUMENT .............................................................22

ARGUMENT .....................................................................................25

I.     Standard of Review.................................................................25

II.   The Board's Finding That the Combined Steigerwald References Disclose "Substantially Uninterrupted" Power Flow Should Be Vacated and Remanded. ..............................................................................26

      A.   The Board Improperly Made New and Erroneous Findings Without Expressly Making a New Ground of Rejection or Giving SynQor an Opportunity to Respond. ....................................................26

           1.   Due Process Requires That the Board Make a New Ground of Rejection When It Makes New Findings. .................................26

           2.   The Board's Reliance, For the First Time, on Average Current $i_o$ in Prior Art Fig. 2a Is a New Ground of Rejection. ..............27

           3.   The Board's New Finding That Average Current $i_o$ Showed Substantially Uninterrupted Power Flow Was Not Supported by Substantial Evidence. .................................................35

      B.   The Board Erred by Failing to Consider SynQor's Argument That the Alternative Steigerwald Embodiment Lacks "Substantially Uninterrupted" Power Flow Due to the Timing of the Synchronous Rectifiers. ..........................................................40

III.  The Obviousness Rejections Should Be Reversed or Remanded. ................45

      A.   The Board's *Prima Facie* Obviousness Determinations Were Erroneous. ..........................................................46

           1.   The Board Erred in Finding That Claim 49 Was *Prima Facie* Obvious. ..................................................46

           2.   The Board Erred in Finding That Claims 23, 25, 27-30, and 50 Were *Prima Facie* Obvious. ....................................53

      B.   The Board Erred in Finding That the Compelling Evidence of Secondary Considerations Was Outweighed by the "Strong" Case of *Prima Facie* Obviousness. ...............................................58

           1.   The Board Correctly Found Compelling Evidence of Secondary Considerations. ............................................58

           2.   The Board Correctly Found a Nexus Between the Secondary Considerations and the Claims at Issue. ...................................62

3.      The Board Erred in Finding That the Secondary Considerations Were Insufficient to Overcome the "Strong" Case of *Prima Facie* Obviousness. .................................................................65

CONCLUSION ......................................................................................................68

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
No. 2015-1171, ___ F.3d ___, 2016 WL 5864573 (Fed. Cir. Oct. 7,
2016) (en banc) ........................................................................56, 58, 67

*Crocs, Inc. v. Int'l Trade Comm'n*,
598 F.3d 1294 (Fed. Cir. 2010) ..........................................................63

*J.T. Eaton & Co., Inc., v. Atl. Paste & Glue Co.*,
106 F.3d 1563 (Fed. Cir. 1997) .....................................................62, 63

*In re Kumar*,
418 F.3d 1361 (Fed. Cir. 2005) ..........................................................34

*In re Leithem*,
661 F.3d 1316 (Fed. Cir. 2011) .....................................................32, 33

*In re Rambus, Inc.*,
694 F.3d 42 (Fed. Cir. 2012) ..............................................................25

*Rambus Inc. v. Rea*,
731 F.3d 1248 (Fed. Cir. 2013) ....................................................*passim*

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947).............................................................................25

*In re Stepan Co.*,
660 F.3d 1341 (Fed. Cir. 2011) .....................................................33, 34

*SynQor, Inc. v. Artesyn Techs., Inc.*,
709 F.3d 1365 (Fed. Cir. 2013) ....................................................*passim*

*SynQor, Inc. v. Artesyn Techs., Inc. et al.*,
Civ. No. 2:07-CV-497 (E.D. Tex.) ..................................................2, 16

*SynQor, Inc. v. Artesyn Techs., Inc.*,
    No. 2:07-cv-00497, 2011 WL 238645 (E.D. Tex. Jan 24, 2011) .......................58

*SynQor, Inc. v. Vicor Corp.*,
    Civil Action No. 2:14-cv-00287-MHS-CMC (E.D. Tex.) .............................. viii

*Vicor Corp. v. SynQor, Inc.*,
    603 Fed. Appx. 969 (Fed. Cir. 2015) ..........................................................18, 52

*Vicor Corp. v. SynQor, Inc.*,
    Appeal No. 2015-004509 (PTAB May 2, 2016) ...............................................19

*WBIP, LLC. v. Kohler Co.*,
    829 F.3d 1317 (Fed. Cir. 2016) ...............................................................*passim*

## Statutes

5 U.S.C. § 554(b)(3)) ..................................................................................27

## STATEMENT OF RELATED CASES

No appeal in or from this proceeding was previously before this or any other appellate court.

The patent at issue in this appeal, U.S. Patent No. 7,272,021 ("the '021 patent"), is one of several patents asserted in currently-pending litigation between the parties to this appeal, *SynQor, Inc. v. Vicor Corp.*, Civil Action No. 2:14-cv-00287-MHS-CMC (E.D. Tex.).

The '021 patent and related patents in the same family also were found infringed and not invalid in a case affirmed on appeal by this Court:  *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365 (Fed. Cir. 2013) ("SynQor I").  In addition, the '021 patent was the subject of *Inter Partes* Reexamination 95/001,206, which concluded in a certificate issued on September 4, 2014 confirming patentability of claims 1, 9, 15-16, 21-27, 29-31, 39 and 45-47.

Additionally, eight (8) other *inter partes* reexaminations have either been concluded or are currently pending before the PTO involving patents in the same family as the '021 patent:

1.  Reexamination No. 95/001,207, involving U.S. Patent No. 7,072,190 (concluded, certificate confirming patentability issued 9/15/14).

2.  Reexamination No. 95/001,405, involving U.S. Patent No. 7,558,083 (concluded, certificate confirming patentability issued 4/29/15).

3.       Reexamination No. 95/001,406, involving U.S. Patent No. 7,564,702 (concluded, certificate confirming patentability issued 1/5/15).

4.       Reexamination No. 95/001,491, involving U.S. Patent No. 7,269,034 (concluded, certificate confirming patentability issued 3/1/16; merged with 95/001,904, 9/22/14).

5.       Reexamination No. 95/001,702, involving U.S. Patent No. 7,072,190 (pending).

6.       Reexamination No. 95/001,853, involving U.S. Patent No. 7,564,702 (pending, currently on appeal, No. 16-2282).

7.       Reexamination No. 95/001,861, involving U.S. Patent No. 8,023,290 (pending, currently on appeal, No. 16-2283).

8.       Reexamination No. 95/001,904, involving U.S. Patent No. 7,269,034 (concluded, certificate confirming patentability issued 3/1/16; merged with 95/001,491, 9/22/14).

Counsel for SynQor, Inc. are not aware of any other case in this or any other court that will directly affect or be directly affected by this Court's decision in this appeal.

## JURISDICTIONAL STATEMENT

On May 13, 2011, Vicor Corporation filed a request for *inter partes* reexamination pursuant to 35 U.S.C. § 311. The Examiner rejected the challenged claims (Appx252-273), and SynQor appealed to the Board pursuant to 35 U.S.C. §§ 134, 315. The Board issued a Final Written Decision affirming the rejections on May 5, 2015. Appx20-37. SynQor sought rehearing, which the Board granted in part, issuing a Decision on Rehearing confirming the rejections on May 2, 2016. Appx1-19. SynQor filed a timely notice of appeal on July 1, 2016. Appx610-613. This Court has jurisdiction under 35 U.S.C. § 141.

## STATEMENT OF THE ISSUES

I.    Did the Board improperly rely on a new basis for finding that the prior art Steigerwald patents disclosed the "substantially uninterrupted" power flow required by the challenged claims of the '021 patent, requiring a remand to allow SynQor to address this new basis?

II.    Did the Board err in concluding that claims 1, 9, 15, 21, 24, 26, 31, 39, 45, and 47 are anticipated by Steigerwald '090?

III.    Did the Board err in concluding that claims 22, 23, 25, and 27-30 would have been obvious in light of Steigerwald '090?

IV.    Did the Board err in concluding that claim 49 would have been obvious in light of Steigerwald '090 and Pressman?

V.     Did the Board err in concluding that claim 50 would have been

obvious in light of Steigerwald '090, Pressman, and the knowledge of one of

ordinary skill in the art.

## STATEMENT OF THE CASE

## I.     Introduction

This is an appeal from a decision of the Board in an *inter partes*

reexamination of U.S. Patent No. 7,272,021 (the "'021 patent"). This

reexamination is part of a series of cases involving six patents directed to a

revolutionary new power architecture developed by Dr. Martin Schlecht of SynQor

for telecommunications and computer systems. Dr. Schlecht's new architecture,

which became known as "Intermediate Bus Architecture" (or "IBA"), was hailed

in the field, copied by SynQor's competitors, and widely adopted by the industry.

Millions of units of products incorporating Dr. Schlecht's invention have been

sold.

In 2007, SynQor brought suit against most of its major competitors for

infringing its patents, including the '021 patent. *See SynQor, Inc. v. Artesyn

Techs., Inc. et al.*, Civ. No. 2:07-CV-497 (E.D. Tex.) ("*SynQor I*"). In December

2010, a jury rejected the defendants' invalidity challenges and found SynQor's

patents infringed, a result this Court affirmed. *SynQor, Inc. v. Artesyn Techs., Inc.*,

709 F.3d 1365 (Fed. Cir. 2013). One of the defendants (Murata) also filed

reexamination requests, including one directed to the '021 patent, which resulted in confirmation of all claims.

The present reexamination was brought by Vicor, a SynQor competitor that was not a defendant in *SynQor I*, based on much of the same prior art as the Murata reexamination, including two patents to Robert Steigerwald. In the Vicor reexamination, the Board found the '021 patent invalid, contrary to its earlier decision in the Murata proceeding. The Board's bases for doing so were fundamentally flawed.

First, the Board incorrectly found that Steigerwald taught "substantially uninterrupted" power flow, as required by all the '021 claims. In its initial decision, the Board provided only a cursory analysis of the issue that did not address SynQor's arguments. When SynQor pointed this out in its request for rehearing, the Board adopted a completely new basis for its decision, without making a new ground of rejection or giving SynQor an opportunity to respond, as it was required to do under the Administrative Procedure Act. As it turns out, the Board's new basis was wrong, but SynQor was unable to explain that to the Board because the Board's new basis had not been presented earlier. The Board's failure to make a new ground of rejection violated due process, and this case should be remanded to allow SynQor to address the new ground of rejection.

Second, the Board incorrectly found that it would have been obvious to modify Steigerwald to add switching regulators to the output side of its power converter, based on an unrelated statement from the Pressman textbook. The Board's conclusion contradicted the express teachings of Steigerwald itself; as the Board concluded in other reexaminations, one of ordinary skill would have recognized that switching regulators have an inductor that would impair the fundamental operation of the Steigerwald system. The Board's earlier decisions on this point were well-reasoned and correct, and the Board provided no cogent rationale for reaching a different result here.

Third, the Board used an improper hindsight analysis to hold that it would have been obvious to change the voltages used by the Steigerwald system to match those used in the claimed invention. The Board essentially concluded that it would have been a "routine design choice" to use any known voltage with the Steigerwald system. But the voltage range of the '021 patent's claims would be a routine design choice only if a person of ordinary skill knew of the '021 patent and had already decided to try to use Steigerwald to solve the problems addressed by the '021 patent, despite the fact that Steigerwald was directed to a very different application (a pulsed radar system) with different voltages, requirements, and purposes. The Board's use of this hindsight approach was legal error.

Finally, the Board failed to give proper weight to the compelling (and largely undisputed) objective evidence showing nonobviousness. The Board acknowledged both the existence of objective indicia and their nexus to the claimed invention, but improperly dismissed them based on the same flawed reasoning that led it to find the inventions *prima facie* obvious. In other reexaminations, the very same objective indicia were found to support non-obviousness. Once again, the Board provided no cogent rationale for reaching a different result here.

## II.    Statement of Facts

### A.    DC-DC Converter Systems.

The technology in this case involves high-efficiency DC-DC power conversion systems for powering logic circuitry in large computer systems and telecommunication and data communication equipment (such as that used to handle Internet traffic). Appx1107(118:10-20). "DC" stands for "direct current" and flows in one direction only, as contrasted with AC or "alternating current," which is provided at the typical wall outlet and reverses its direction at periodic intervals. Appx1105( 112:12-113:6).

A DC-DC converter, such as the converters at issue here, takes in one DC voltage and converts it to another, typically lower, DC voltage. Appx1105(113:7-12). This conversion is typically performed by converting the DC input into AC,

5

reducing the AC voltage using a device called a "transformer,"[1] and then

converting the AC voltage back into DC using a technique called rectification,

which smoothes out the AC waveform using a device called a rectifier.

Appx1129(58:13-59:8).

A common rectifier for this purpose is a diode, which allows current to flow

in only one direction and has two terminals, an input and an output.  Appx2148.  A

newer type of rectifier is a "synchronous rectifier," which is implemented as a

transistor with three terminals:  an input, output, and control terminal for turning

the transistor on and off so that it behaves as a rectifier.  Appx1371(1:33-43).

Synchronous rectifiers can reduce conduction energy loss when the device is on as

compared to a diode.  Appx1371(1:31-39).  Synchronous rectification was known

in the 1990s, but was rarely used due to a number of technical challenges.

Appx1371(1:33-53); Appx1108(125:6-23).

### B.    Prior Art DC-DC Converter Systems.

Before the SynQor inventions, large computer and telecommunications

systems typically used a power architecture known as distributed power

architecture ("DPA").  Appx1116(6:18-8:18).  DPA systems used a centralized

---

[1] A transformer transfers electrical energy from a "primary" winding (such as a coiled wire) to a "secondary" winding using magnetic fields.  Depending on the ratio of the turns in the primary and secondary windings, the transformer can provide an output voltage that is either lower or higher than the input voltage.

AC/DC converter (called a "front-end converter") that received AC power from the utility and converted it to a DC voltage of about 48 volts.  Appx1116(7:2-10).  This 48-volt DC output was then sent to multiple large circuit boards, known as "load boards," which held complex logic circuitry.  Appx1107(118:10-119:10), Appx1116(7:6-8:3).  Each load board had one or more board-mounted DC-DC converters that converted the 48 volts from the front-end converter into a lower DC output (typically five volts or less) to drive the board's logic circuitry.  Appx1116(8:4-18).

These prior art DPA board-mounted DC-DC converters had to perform two functions: "isolation" and "regulation."  A converter performs "isolation" by isolating the input of the converter from the output, which enhances safety and prevents unwanted noise.  Appx1166-1167(28:19-30:25).  In an isolated converter, power is transferred without a direct wire connection from the input to the output side.  Appx1118(17:11-22).  Instead, a transformer converts the current into a magnetic field on the input side, passes that magnetic field to the output side, and then converts that magnetic field back into electric current.  Appx1118-1119(17:23-19:2.)  A converter provides "regulation" by controlling the output voltage toward a desired value, even when the input voltage or other parameters vary.  Appx1118(15:15-16:20.)

In the 1990s, the number of different voltages needed by logic circuitry on a single load board began to increase substantially. Appx1116-1117(9:6-10:16). This created space problems on the boards because a separate isolating/regulating DC-DC converter was typically needed for each logic level voltage, consuming space that could otherwise have been used for microprocessors, memory, and other logic circuitry. Appx1117(10:18-11:16); Appx1119(19:7-15).

### C.    The Schlecht Inventions.

In 1997, Dr. Schlecht, then a professor of electrical engineering at MIT and later the founder of SynQor, came up with a revolutionary new power architecture. Dr. Schlecht sought to make a power system that was more efficient (so that it would dissipate less power and heat), and smaller (so that it would take up less space on a load board). Appx1107(118:8-119:14). But with the existing DPA architecture, making converters smaller reduced efficiency, while increasing their efficiency made them larger. Appx1107(119:15-120:2).

To solve this problem, Dr. Schlecht came up with a new approach. He took the isolating/regulating board-mounted converters used in DPA systems, split the isolation and regulation functions into two different "stages," and used his new ideas on converter design to increase the efficiency of the isolation stage. Appx1117(11:19-12:22); Appx1119(20:13-21:10). This idea was radical because, although multiple-stage converters had been used many years earlier, the industry

had largely abandoned them as outdated, inefficient, and wasteful of board space compared to single-stage converters.  Appx1107-1108(120:11-123:12).  Dr. Schlecht realized that he could make a two-stage system that would be efficient and compact, and would be especially suited for load boards that needed multiple voltages.  Appx1107-1108(120:11-122:3); Appx1117(11:21-13:11).

In Dr. Schlecht's novel power architecture, the first stage (which became known as a "bus converter") provided isolation while converting the output of the front end (the AC/DC converter) to an intermediate DC output (called an "intermediate bus").  This first stage did not need to provide regulation because its output, the intermediate bus, did not directly drive logic circuitry. Appx1117(11:21-13:11).  The intermediate bus was fed to second-stage converters, which tightly regulated the voltage to the levels needed for logic circuitry without any need for further isolation.  *Id.*  Because Dr. Schlecht's intermediate bus architecture ("IBA") required only a single isolating converter per board, and could use smaller and simpler non-isolated converters to provide the needed regulated voltages, Dr. Schlecht's architecture provided more power at more voltages in less space with greater flexibility.  Appx1119(19:3-25).

Dr. Schlecht overcame the efficiency and size drawbacks of prior two-stage approaches by carefully designing his two stages.  For example, his isolation stage incorporated a circuit topology and a synchronous rectification scheme with certain

characteristics.  Appx1119(20:3-21:10).  An embodiment of Dr. Schlecht's

isolation stage is shown in Fig. 3 of original 1997 patent application, which the

'021 patent incorporates by reference:



Appx1365 (Fig. 3).

Additionally, because the regulation stage did not provide isolation, Dr.

Schlecht's regulation stage could use very efficient non-isolated switching

regulators.[2]  Appx1125(43:8-10); Appx1128(56:4-14).  An embodiment of a non-

isolated switching regulator used for the regulation stage is also shown in Fig. 3 of

Dr. Schlecht's original application:

---

[2] A switching regulator operates by controlling a switch (shown as $Q_R$ in the
diagram on the next page) to turn it on and off to cause the output voltage to be
maintained at a predefined value.  In contrast, a linear regulator regulates the
output by controlling the resistance of the regulator.  The figures in Dr. Schlecht's
patents depict switching regulators, although some of the broader claims allow for
the use of linear regulators, as well.



Appx1365(Fig. 3).  Using this approach, Dr. Schlecht was able to achieve a higher

efficiency in a smaller size and with greater flexibility than the DPA technology

available at the time.  Appx1119(20:20-23).

### D.    The '021 Patent.

The '021 patent is one of a family of SynQor patents that date back to the

original application filed in 1997.  Appx38; Appx1120-1121(24:24-28:9);

Appx1121-1122(29:14-31:3).  This original application discusses various

implementations of two-stage converter systems, including, *inter alia*, unregulated

IBA systems having a non-regulated isolation stage and multiple non-isolated

regulation stages.  Appx38; Appx1362; Appx1121(26:18-27:1); Appx1122-

1123(31:16-34:19).

The '021 specification shows in Fig. 5 a block diagram of "an Intermediate

Bus Architecture (IBA) implementation of the invention":



FIG. 5

Appx47; Appx48(2:66-67)(annotations added). In the IBA system shown in Fig. 5, an isolation stage receives a 48-volt input (the typical input for telecom and large computer systems) and produces a 12-volt intermediate bus, which is fed to multiple regulation stages, each providing a different output voltage (specifically 5 volts, 3.3 volts, and 1.8 volts). Appx47; Appx50(5:13-15) (describing an input voltage "that varies over the range of 36-75 volts"). The specification explains that the outputs are "of a voltage level to drive logic circuitry." Appx50(5:18-19).

In Figs. 1-3, the specification depicts specific circuitry used to implement an unregulated isolation stage, including synchronous rectification.  Appx49(3:1-27).  An example is shown in Fig. 1:



FIG. 1

Synchronous rectifiers

Appx40.

The '021 patent explains that this converter includes substantially uninterrupted power flow, stating that "power is always flowing from input to output (except during the brief switch transitions)."  Appx49(4:9-11).  This differed from the prior art DPA single-stage converters, which required substantial interruptions in power flow to perform the regulation function.  By making the power flow in the isolation stage substantially uninterrupted, Dr. Schlecht's

converters were able to achieve a much higher efficiency.  Appx1126-1127(48:11-50:7.)

Each of the claims of the '021 patent includes an "isolation stage" having, among other things, a "secondary winding circuit" comprising "a secondary transformer winding in series with a controlled rectifier having a parallel uncontrolled rectifier."[3]  Appx50(6:25-29).  Each of the claims also requires "substantially uninterrupted flow of power through the primary and secondary winding circuits during normal operation" of the isolation stage.  Appx50(6:34-36).  Claim 1 is exemplary:

> 1.  A power converter system comprising:
>
> a normally non-regulating isolation stage comprising:
>
> a primary winding circuit;
>
> a secondary winding circuit coupled to the primary winding circuit, the secondary winding circuit comprising a secondary transformer winding in series with a controlled rectifier having a parallel uncontrolled rectifier, the secondary winding circuit providing a normally non-regulated output of the isolation stage; and
>
> a control circuit which controls duty cycle of the primary winding circuit, the duty cycle causing substantially uninterrupted flow of power through the primary and secondary winding circuits during normal operation; and

---

[3] One type of synchronous rectifier has a controlled rectifier with a parallel uncontrolled rectifier.

> a plurality of non-isolating regulation stages, each
>     receiving the non-regulated output of the isolation
>     stage and regulating a regulation stage output.

Appx50.

During the current *inter partes* reexamination proceedings, SynQor proposed

adding two additional dependent claims, claims 49 and 50.  Appx115.  Claim 49

recites that "the regulation stages are switching regulators," thus making it possible

to increase efficiency by limiting the claimed system to one with switching

regulators depicted in the specification and excluding linear regulators.   Appx115.

Claim 50 adds the additional limitations that "the DC power source provides a

voltage within the range of 36 to 75 volts, and wherein the regulation stage output

is of a voltage level to drive logic circuitry," to match the voltage levels described

in the specification and used in the telecom/computer systems that were the subject

of Dr. Schlecht's invention.  Appx115.

###    E.    Earlier Proceedings Concerning the '021 Patent.

This proceeding is part of a series of lawsuits and reexaminations concerning

the SynQor patents.  These proceedings are summarized below.

### 1.    The 497 Action.

In 2007, SynQor filed suit asserting infringement of five patents, including the '021 patent,[4] against numerous competitors. *See SynQor, Inc. v. Artesyn Techs., Inc. et al.*, Civ. No. 2:07-CV-497 (E.D. Tex.) ("the 497 action" or *SynQor I*"). Appx1383. The defendants asserted invalidity counterclaims and defenses raising, *inter alia,* the Steigerwald and Pressman references at issue in this appeal. Appx1700, Appx1709-1710, Appx1726, Appx1755-1761. SynQor responded by highlighting the differences between the claimed invention and the prior art and introducing extensive evidence of commercial success, long-felt need, skepticism, industry acclaim, and copying. *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1376-77 (Fed. Cir. 2013). In December 2010, a jury found each of the asserted claims infringed and not invalid, and awarded over $95 million in damages. *Id.* at 1372. The district court thereafter entered a permanent injunction. *Id.* at 1383-84.

Defendants appealed, and this Court affirmed. 709 F.3d 1365. In affirming the district court's ruling on obviousness, this Court held that "SynQor introduced extensive objective evidence of nonobviousness at trial, including commercial success, industry recognition, initial (pre-invention) skepticism of experts,

---

[4] The related patents in the 497 action were U.S. Patent No. 7,072,190 (the "'190 patent"), U.S. Patent No. 7,564,702 (the "'702 patent"), U.S. Patent No. 7,558,083 (the "'083 patent"), and U.S. Patent No. 7,269,034 (the "'034 patent").

16

unexpected results, and copying by competitors." *Id.* at 1377.  The Court found

that "[t]he record links this convincing evidence to the claimed invention thus

supplying a nexus to the claimed intermediate bus architecture." *Id.*

### 2.    The Murata Reexaminations.

One of the defendants in the 497 action, Murata, filed requests for

reexaminations of each of the patents at issue in that case (including the '021

patent), with he exception of the '034 patent, which was the subject of a

reexamination filed by another defendant.  Appx1466-1629.  The Examiner in

those reexaminations rejected the claims based on references that included the

Steigerwald '090, Steigerwald '539, and Pressman references.  Appx1471-1473.

The Board ultimately found the claims of the challenged patents, including the

'021, to be patentable, rejecting Murata's arguments.  Appx1466-1629.  Murata did

not appeal.

### 3.    The Vicor Reexaminations.

#### a)    Overview.

Vicor filed its own requests for *inter partes* reexaminations of the '190,

'702, and '021 patents at issue in *SynQor I*, as well as for another SynQor patent,

U.S. Patent No. 8,023,290 (the "'290 patent').  In the Vicor '190 reexamination,

the Board upheld all of the challenged claims.  Specifically, it found that claims

20-23, 27, 29, 30, 32, and 33 were not anticipated by Steigerwald '090 and

Steigerwald '539.  Appx1635.  The Board also found that the remaining, narrower

claims were not obvious over various combinations of references, including Steigerwald '090, Steigerwald '539, Pressman, and an article by Cobos. Vicor appealed.

On appeal, this Court reversed in part, finding certain of the broadest claims anticipated by Steigerwald '090, incorporating by reference Steigerwald '539. Although the figure and text of Steigerwald '090 showed only the use of diode rectifiers, the Court reasoned that when combined with Steigerwald '539, it disclosed an alternative embodiment "substituting controlled rectifiers for diodes within the capacitance-multiplying converter." *Vicor Corp. v. SynQor, Inc.*, 603 Fed. Appx. 969, 975 (Fed. Cir. 2015). The Court also vacated and remanded the nonobviousness rulings "for further consideration in light of our conclusion that the combined Steigerwald reference anticipates" the broader claims. *Id.* It also remanded the Board's ruling that the claims were not obvious in light of Cobos and Pressman so that Vicor would "have the opportunity to argue that SynQor's evidence of commercial success is attributable not to the claimed invention, but to the prior art converter taught by the combined Steigerwald references." *Id.* at 975-76. Following remand, the Board rejected the claims and made a new ground of rejection, and SynQor requested that prosecution be reopened. The Vicor '190 reexamination is currently pending in the PTO.

18

Following this Court's decision in the Vicor '190 reexamination, the Board issued opinions in the Vicor reexaminations of the other three SynQor patents. In the '702 and '290 reexaminations, the Board found all of the claims at issue patentable over the prior art. Appx1658-1698; *Vicor Corp. v. SynQor, Inc.*, Appeal No. 2015-004509 (PTAB May 2, 2016). In the present case, the '021 reexamination, the Board found all of the claims at issue unpatentable. Following requests for rehearing in the '702 and '021 reexaminations, the Board continued to uphold all the '702 claims and reject all the '021 claims; Vicor did not seek rehearing in the '290 reexamination. Vicor appealed the Board's decisions in the '702 and '290 reexaminations, and SynQor took the present appeal of the Board's decision in the '021 reexamination. These appeals are all pending before this Court.[5]

### b)    The Vicor '021 Reexamination.

Vicor filed its request for *inter partes* reexamination of the '021 patent on May 31, 2011. Appx64-92. The PTO granted the request and issued a first office action adopting Vicor's proposed rejections without setting forth any analysis, instead simply referencing Vicor's submission. Appx104-110. For example, in the anticipation rejection based on Steigerwald, the Examiner merely stated that Vicor's proposed rejection "is adopted for the reasons set forth in the request for

---

[5] Appeal Nos. 2016-2282, -2283, and -2288.

reexamination as shown in the explanation at pages 5-11 and the item-matching at pages 12-21 of [the] Claim Chart of the request, which is hereby incorporated by reference."  Appx108.

In response, SynQor submitted evidence, including from the *SynQor I* litigation, as well as declarations from Dr. Schlecht and from Dr. James Dickens, a professor of Electrical and Computer Engineering at Texas Tech University. Appx2289-2308; Appx1026-1036; Appx1037-1072.  Among other things, SynQor argued that the prior art did not disclose the "substantially uninterrupted" power flow of the claimed converters, and that it did not make obvious the use of those converters with switching regulators or in the claimed voltage ranges.  Appx127-130.  SynQor also included an amendment adding new dependent claims 49 and 50.  Appx115.  Vicor submitted comments in response.  Appx203-251.

In response to the comments, the Examiner maintained the rejections, and further rejected new claims 49 and 50 (Appx252-273), again simply referencing Vicor's arguments (Appx257-258).  The parties submitted another round of comments, and the Examiner issued a Right of Appeal notice.  Appx274-329.

On May 5, 2015, the Board issued an opinion affirming the Examiner's rejection of all claims.  Appx20-37.  The Board resolved the issue relating to "substantially uninterrupted" power flow with only a cursory analysis, stating that "[t]he Requester and Examiner have observed that the converters of Steigerwald

'090 have substantially uninterrupted power flow because the two transformers operate 180 degrees out of phase with a complementary 50% duty cycle," and "[w]e therefore are not persuaded by the Patent Owner's arguments of error." Appx29-30.

The Board's bases for its decision on the dependent claims were, if anything, even weaker. As to dependent claim 49, the Board acknowledged that Steigerwald taught against using switching regulators because they would add inductors to the output path, but found nonetheless that it would have been obvious to add the very switching regulators that Steigerwald taught against. Appx32-34. The Board stated that the existence of an alternative synchronous rectifier embodiment in the Steigerwald patents "weighs heavily against the [SynQor] position," but never explained what a synchronous rectifier had to do with a switching regulator. Appx34. The Board also summarily upheld the rejections of the dependent voltage level claims on the theory that the claimed voltages were a "routine design choice," without explaining why one of skill would choose to use those voltages with the Steigerwald converters. Appx30, Appx34-35. Finally, the Board dismissed the objective indicia of nonobviousness, finding a lack of "the requisite nexus to the dependent claim features." Appx32.

SynQor filed a request for rehearing. Appx531-570. The Board granted the request-in-part. Appx1-19. In its Decision on Rehearing, the Board maintained

the rejections, but raised a new basis for finding that Steigerwald disclosed "substantially uninterrupted" power flow, specifically that "average current $i_o$" in prior art Figs. 1 and 2a of Steigerwald '539 provided the necessary disclosure. Appx7-9. As to the dependent claims, the Board maintained its earlier rejections, providing little additional analysis. Appx11-13. However, the Board amended its earlier decision by deleting its original discussion of secondary considerations and replacing it with a new analysis. Appx15. In this new analysis, the Board found that secondary considerations existed and had a nexus to the claimed inventions, but concluded the secondary considerations were "insufficient to overcome the strong case of obviousness." Appx16-18.

## SUMMARY OF ARGUMENT

In upholding the rejections of the '021 patent claims, the Board made four overarching mistakes.

First, the Board improperly relied on a new basis for concluding that the Steigerwald references taught "substantially uninterrupted" power flow, as required by all of the claims at issue. For the first time in its Decision on Rehearing, the Board made a new finding that the average current $i_o$ shown in Figs. 1 and 2 of Steigerwald '539 reflected uninterrupted power flow in the Steigerwald invention, and made this finding the centerpiece of its decision. The Board's new finding was incorrect, rested on technical inaccuracies, and confused the operation

22

of what Steigerwald presented as prior art (set forth in Figs. 1 and 2 of Steigerwald '539) with the converters of the Steigerwald invention itself (set forth in Figs. 4-9 of Steigerwald '539 and the sole Figure of Steigerwald '090).  SynQor, however, had no opportunity to point out the Board's errors because this basis for rejection was never proposed before.  In these circumstances, the Board was required to designate its decision a new ground of rejection and provide SynQor an opportunity to respond.  Because the Board failed to do so, its decision should be vacated and remanded to allow SynQor to respond, and the Board should be directed to consider and address the arguments SynQor made below, including that Steigerwald did not disclose substantially uninterrupted power flow in the embodiments using synchronous rectifiers.

Second, the Board erred in concluding that the use of switching regulators in dependent claim 49 was obvious in light of Steigerwald and Pressman.  The Board acknowledged (as it had in previous decisions) that Steigerwald expressly taught *not* to use switching regulators at the output because they would add an inductor to the output path, and Steigerwald taught that inductance in the output path was to be avoided.  But here, the Board minimized this problem and found the claims obvious because Pressman allegedly suggested that switching regulators could improve efficiency.  The Board provided no coherent rationale for how a person of ordinary skill would expect to overcome the problems created by adding an

inductor to Steigerwald, problems which the Board found in previous decisions to support nonobviousness. Its conclusion here was incorrect and should be reversed.

Third, the Board erroneously found that certain dependent claims that recite specific voltage levels would have been obvious in light of Steigerwald. For example, claim 50 of the '021 patent recites an input voltage of 36 to 75 volts, which is the range used for the telecom/computer systems that were the subject of Dr. Schlecht's novel power architecture. The Steigerwald patents, however, are directed to a very different application, a pulsed power conversion system for radar, and teach the use of an input voltage of 100 volts or more. The Board disregarded evidence showing that a person of ordinary skill would not reduce Steigerwald's voltage because doing so would undermine the purpose of the Steigerwald invention. The Board also disregarded the differences between the Steigerwald pulsed radar system and the telecom/computer systems that use the claimed voltage range. Instead, the Board simply stated in conclusory fashion that using the claimed range with Steigerwald's radar system would be a "routine design choice." But the claimed range would not have been a routine design choice to a person of ordinary skill confronting the problems addressed by Steigerwald, nor would it have been a routine design choice to use Steigerwald to solve the problems addressed by the '021 patent. The Board committed error in concluding otherwise.

Finally, in assessing obviousness, the Board failed to give due weight to the compelling evidence of secondary considerations.  The Board acknowledged both the existence of the secondary considerations and a nexus between them and the claims at issue, but concluded that these objective indicia were outweighed by the *prima facie* case of obviousness, relying on nothing more than the flimsy reasoning it pointed to earlier, reasoning that the Board itself correctly rejected multiple times in its rulings in prior reexaminations.  The Board erred in finding that the secondary considerations were insufficient to overcome the weak obviousness case, and for this reason too its opinion should be reversed.

## ARGUMENT

### I.    Standard of Review.

This Court reviews the Board's "factual findings for substantial evidence and its legal conclusions *de novo*."  *Rambus Inc. v. Rea*, 731 F.3d 1248, 1251 (Fed. Cir. 2013).  This Court "must judge the propriety of" an agency's action "solely by the grounds invoked by the agency," and these grounds "must be set forth with such clarity as to be understandable."  *SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947).

Anticipation is a question of fact reviewed for substantial evidence.  *In re Rambus, Inc.*, 694 F.3d 42, 46 (Fed. Cir. 2012).  Obviousness is a question of law reviewed *do novo*, based on underlying factual determinations – including the

scope and content of the prior art, the differences between the claims and the prior art, the level of ordinary skill in the art, and objective evidence of nonobviousness. *Rambus v. Rea*, 731 F.3d at 1251-52.

## II. The Board's Finding That the Combined Steigerwald References Disclose "Substantially Uninterrupted" Power Flow Should Be Vacated and Remanded.

In its Decision on Rehearing, the Board improperly relied on a new ground of rejection to find that the Steigerwald '090 patent (incorporating by reference the Steigerwald '539 patent) disclosed "substantially uninterrupted" flow of power in the secondary winding circuit, as required by all the '021 claims. The Board did so by relying for the first time on "average current $i_o$" in Figs. 1 and 2a of Steigerwald '539. Appx7-9. The Board also erred by failing to consider SynQor's argument that Steigerwald does not teach "substantially uninterrupted" power flow in the alternative synchronous rectifier embodiment.

### A. The Board Improperly Made New and Erroneous Findings Without Expressly Making a New Ground of Rejection or Giving SynQor an Opportunity to Respond.

#### 1. Due Process Requires That the Board Make a New Ground of Rejection When It Makes New Findings.

Under the Administrative Procedure Act, the PTO must ensure that parties are "fully and fairly treated at the administrative level." *Rambus v. Rea*, 731 F.3d at 1255 (quoting *In re Leithem*, 661 F.3d 1316, 1319 (Fed. Cir. 2011)). The APA requires that "the PTO must 'provide prior notice to the applicant of all matters of

fact and law asserted prior to an appeal hearing before the Board.'" *Id.* (quoting *In re Stepan Co.*, 660 F.3d 1341, 1345 (Fed. Cir. 2011)); 5 U.S.C. § 554(b)(3)).

This regulatory framework "limits the Board's ability to rely on different grounds than the examiner." *Id.* The Board "may not 'rely on new facts and rationales not previously raised to the applicant by the examiner.'" *Id.* (quoting *Leithem*, 661 F.3d at 1391). If the applicant has not had a "fair opportunity to react to the thrust of the rejection," the Board "must designate its decision a new ground of rejection and provide the appellant with an opportunity to respond." *Id.* at 1255-56 (citation omitted). "Failure to do so violates the appellant's notice rights and warrants vacatur of the Board's decision." *Id.* at 1256. Whether the Board relied on a new ground of rejection is a legal issue that this Court reviews *de novo*. *Id.*

### 2. The Board's Reliance, For the First Time, on Average Current $i_o$ in Prior Art Fig. 2a Is a New Ground of Rejection.

In its Decision on Rehearing, the Board found that average current $i_o$ in Fig. 2a of Steigerwald '539 (a figure labeled "<u>Prior Art</u>") showed that power was constantly flowing in the secondary winding circuit of the Steigerwald converters, and thus found that the Steigerwald alternative embodiment had substantially uninterrupted power flow. This argument was not only completely new, but (as discussed in section II.A.3 *infra*) was wrong because it confused the circuits of the

Steigerwald invention with the very different prior art circuit (the subject of Figs. 1 and 2a) which the Steigerwald invention was meant to improve upon.

The Examiner never relied on average current $i_o$ in his rejections. In the initial Non-Final Office Action, the Examiner simply referenced pages 5-11 and 12-21 of Vicor's reexamination request. Appx108. In the referenced pages, Vicor made no mention of average current $i_o$ in prior art Figs. 1 and 2a. Appx70-86. Vicor pointed instead to two passages from Steigerwald (Appx631(2:51-53) and Appx626(3:33-35)) describing the capacitance-multiplying converter of the Steigerwald invention, and explaining that in those converters "the energy-storage capacitor Ce is always transformer-coupled to the positive and negative dc output buses." Appx76, Appx79. Those passages do not say anything about average current $i_o$ nor do they describe the prior art converter; indeed, capacitor Ce (which takes advantage of the capacitance multiplication feature of Steigerwald) is not even present in the prior art embodiment of Figs. 1 and 2a. Appx615-616 (Figs. 1, 2a).

Nor did SynQor rely on average current $i_o$ in responding to the Examiner's rejection. Instead, SynQor argued, *inter alia*, that Steigerwald powered a pulsed load and therefore had periods between the pulses where there was no current and (because power equals voltage times current) no power. SynQor pointed to Fig. 2a of Steigerwald '539 to show this load current (labeled $i_{load}$):



*FIG. 2a*
PRIOR ART

Appx127-128. The load current $i_{load}$ was relevant because it illustrated the pulsed loads that the Steigerwald invention was designed to power. Appx127-128; Appx625(2:53-55). SynQor did not refer to or rely on average current $i_o$ because (as discussed further in Section II.A.3 *infra*) $i_o$ was specific to the converter Steigerwald identified as "prior art" and was not present in the converters Steigerwald disclosed as improvements.

The Examiner's Action Closing Prosecution likewise made no reference to average current $i_o$. The Examiner maintained his earlier rejection, citing to the same pages of Vicor's Reexamination Request as before. Appx257. The Examiner also responded to SynQor's arguments by asserting that there would be substantially uninterrupted power flow (even when there is no load) because the Steigerwald invention will "produce a magnetic flux (i.e. power)" that "induces voltage across the secondary windings." Appx263-264. The Examiner made no mention of average current $i_o$ in Fig. 2a.

The Board issued its decision affirming the Examiner on May 5, 2015. This decision too made no mention of average current $i_o$. Appx24-30.

The first time average current $i_o$ surfaced was in the Board's Decision on Rehearing, where the Board not only relied on it to support the rejections, but made it the centerpiece of its decision. Appx7-9. In response to SynQor's argument that there are power interruptions in Steigerwald due to the pulsed load, the Board acknowledged that "[i]t is true that there is an intermittent full load for a time period 't' while the radar transmission occurs, as argued by the Patent Owner." Appx7. "However," the Board continued, "*we observe that Patent Owner does not discuss the import of the line marked $i_o$ in Figure 2a*." Appx7 (emphasis added). The Board then cited two passages from Steigerwald '539 discussing average current $i_o$ – Column 2, lines 17-18 and Column 2, lines 55-57 (Appx625(2:17-18, 55-57)) – passages which neither the Examiner nor Vicor had ever relied upon. Based on these newly-cited passages, the Board found that average current $i_o$ reflected substantially uninterrupted power flow in the converters of the Steigerwald invention, stating that "it appears on this record that Steigerwald describes its embodiments include a *continual average current without substantial interruption* to run control circuitry." Appx8 (emphasis added). This was the first time any such suggestion, much less finding, had been made.

The Board also relied on average current $i_o$ to respond to another SynQor argument. SynQor had argued that the Examiner failed to show that Steigerwald's alternative synchronous rectifier embodiment had substantially uninterrupted power flow because the synchronous rectifiers were turned off for a period of time, which would cause power interruptions. Appx8. In response, the Board again found that average current $i_o$ demonstrated that there was substantially uninterrupted power flow in this embodiment:

> Steigerwald '539 observes that '[t]he power converter receives an input current in and **supplies average current $i_o$** to energy-storage capacitor $C_{out}$ and the load.'… **Note line $i_o$ in Figure 2a**. As a consequence, we are not persuaded that Steigerwald '539 does not describe a continuous power flow.
>
> We have considered the attorney argument concerning interruption in the boundary between each half cycle (Req. Reh'g. 5-7) and the degree of interruption of power flow (Req. Reh'g 7-9). However, in view of the description of Steigerwald '090 as noted above, **including that describing average current**, we are unpersuaded that we have overlooked or misapprehended any facts or arguments.

Appx9 (emphases added).

Before the Board's Decision on Rehearing, neither the Board nor the Examiner ever relied on average current $i_o$ to find substantially uninterrupted power flow. Nor did they ever rely on the portions of the Steigerwald '539 specification describing average current $i_o$. In raising these arguments for the first

31

time on rehearing, the Board relied "on new facts and rationales not previously raised to the applicant by the Examiner," and did not give SynQor a "fair opportunity to react" to these new facts and rationales. *See Rambus v. Rea*, 731 F.3d at 1255 (citations omitted). Thus, the Board was required to "designate its decision a new ground of rejection and provide [SynQor] with an opportunity to respond." *Id.*

In analogous situations, this Court has not hesitated to find that the Board effectively made a new ground of rejection and to vacate and remand as a result. For example, in *Leithem*, this Court found that the Board made a new ground of rejection where the Board found "facts not found by the examiner regarding the differences between the prior art and the claimed invention." *Leithem*, 661 F.3d at 1320. The invention at issue in *Leithem* was the use of cold caustic fluffed wood pulp with improved absorbency. *Id.* at 1317. The Examiner used the Novak reference (among others) to reject the claims, finding that Novak taught the use of a fluff pulp. *Id.* at 1320. On appeal to the Board, the patent owner argued that the pulp material taught by Novak was not fluffed. *Id.* at 1317-18. The Board affirmed the Examiner's decision but modified the rationale, finding that Novak taught a pulp "which may be fluffed," rather than a fluffed pulp. *Id.* at 1318, 1320. This Court vacated and remanded, because the Board "found new facts concerning the scope and content of the prior art" relating to "whether the prior art discloses or

teaches fluffing cold caustic extracted wood pulp," and "fairness dictates that the applicant … should be afforded an opportunity to respond to the Board's new rejection." *Id.* at 1320.

Similarly, in *Rambus v. Rea*, the Board affirmed an Examiner's obviousness rejection based on two references (iAPX and Inagaki), but relied on a different reason for combining the references than the Examiner did. 731 F.3d 1256. This Court vacated and remanded, holding that "[w]hile the Board's findings may ultimately be correct, we will not affirm a Board rejection, like this one, which essentially provides a new motivation to combine the references." *Id.* It directed the Board to apply its "procedure for issuing a new ground of rejection," and explained that Board cannot "shortcut this procedure and deprive appellants of their due process rights." *Id.*

To the same effect is *In re Stepan*, in which the Board affirmed an obviousness rejection using the same references as the Examiner, but found that one of the references (Singh) was prior art under 35 U.S.C. § 102(a) rather than § 102(b). *Stepan*, 660 F.3d at 1343. The Board also found that the declaration submitted by the appellant was insufficient to remove that reference as prior art. *Id.* This Court vacated and remanded, holding that "[b]y making and relying on new fact findings regarding an issue the examiner did not raise, *i.e.*, the sufficiency of Stepan's Declaration to swear behind the Singh reference as § 102(a) prior art,

33

the Board relied on a new ground of rejection." *Id.* at 1344. The Court held that the Board's reliance "on the same type of rejection or the same prior art references relied upon by the examiner" was "insufficient to avoid a new ground of rejection." *Id.* at 1345. *See also In re Kumar*, 418 F.3d 1361, 1367-68 (Fed. Cir. 2005) (finding a new ground of rejection where the Board "found facts not found by the examiner regarding the differences between the prior art and the claimed invention, which in fairness required an opportunity for response").

In this case, the Board clearly relied on new factual findings when it found that average current $i_o$ in prior art Fig. 2a of Steigerwald '539 meant that the converters of the Steigerwald invention disclosed "substantially uninterrupted" power flow. The Examiner made no such finding, and it was first articulated in the Board's Decision on Rehearing. The Board did not "provide prior notice" to SynQor "of all matters of fact and law asserted prior to an appeal hearing before the Board," as required by the APA and this Court's precedent, and SynQor did not have a "fair opportunity to react to the thrust of the rejection." *See Rambus v. Rea*, 731 F.3d at 1255 (citations omitted). This Court should vacate the Board's decision and remand.

### 3.    The Board's New Finding That Average Current $i_o$ Showed Substantially Uninterrupted Power Flow Was Not Supported by Substantial Evidence.

The Board's finding that average current $i_o$ in Fig. 2a of Steigerwald '539 discloses that the Steigerwald converters provide substantially uninterrupted power flow is not only completely new, but is also based on an incorrect understanding of Steigerwald.

The Board's fundamental error was to confuse the features of the converters of the Steigerwald invention (represented in Figs. 4 and 6-9 of Steigerwald '539 and the sole figure of Steigerwald '090) with the features of the very different "prior art" converter that Steigerwald sought to improve upon (represented in Figs. 1-2 of Steigerwald '539). The Board's confusion apparently stemmed from the fact that the converters of the Steigerwald invention and the prior art converters were designed to power the same pulsed radar load. The Board, however, failed to recognize that the converters themselves are structurally very different, and produce very different output currents.

Figure 2a of Steigerwald '539 depicts two different currents, $i_{load}$ and $i_o$, in the prior art system shown in Fig. 1. $i_{load}$ is the load current required by the pulsed radar systems that both the "prior art" system and Steigerwald's converter were intended to power. Appx128. Because the Steigerwald converters were designed

to power the same load as the prior art converters, $i_{load}$ is necessarily the same for both. This load current $i_{load}$ is shown in Fig. 2a:



**FIG. 2a**
PRIOR ART

Appx616(Fig. 2a).

In contrast to load current $i_{load}$, which is dictated by the power needs of the pulsed radar system rather than by the structure of the converter, average current $i_o$ in Fig. 2a is entirely a function of the nature and structure of the "prior art" converter (including its location relative to the energy storage capacitor). The Board failed to recognize this fundamental fact, and thus failed to recognize that the Steigerwald converters do not and cannot produce an output current corresponding to average current $i_o$ of the "prior art" converters depicted in Fig. 1.

The prior art converter of Fig. 1 is shown below:



**FIG.1**
PRIOR ART

Appx615(Fig. 1).  The prior art power converter 12 of Fig. 1 does not instantaneously supply all of the load current ($i_{load}$) that powers the pulses in the radar system (pulsed load 10).  Instead, the prior art converter 12 only supplies average load current $i_o$, which is less than the peak current during the pulses (as Fig. 2a shows).  During a pulse, the difference between load current $i_{load}$ and average current $i_o$ is provided by energy storage capacitor $C_{out}$.  Appx625(2:59-62).  ("the energy storage capacitor" $C_{out}$ "supplies the peak pulse power" to the load).  Between the pulses, when $i_{load}$ is zero, the average current $i_o$ of converter 12 flows into energy storage capacitor $C_{out}$, recharging it for the next pulse.  Appx625(2:55-57).  So, in the converter of Fig. 1, the energy storage capacitor $C_{out}$ receives the output current of the converter (which is the average current $i_o$) and, when

37

sufficient energy has been stored, capacitor $C_{out}$ supplies most of the load current to the radar system.  Appx615(Fig. 1).

This is fundamentally different than the Steigerwald system.  In Steigerwald, the energy storage capacitor is not located at the output of the converter.  Instead, as shown in Fig. 4, Steigerwald moves the energy storage capacitor Ce to the input of an isolating converter, which he shows as capacitance-multiplying converter 20:



FIG. 4

Appx618(Fig. 4).  Because the energy storage capacitor Ce is at the input of Steigerwald's capacitance-multiplying converter 20, the peak pulse current (and therefore power) to drive the radar system is supplied from energy storage

capacitor Ce *through the converter directly to the pulsed load*.  Appx626(3:12-13) (the converter must "maintain[] a relatively high bandwidth for supplying fast-rising pulsed loads").  Therefore, *the output current of the converter corresponds to the load current $i_{load}$; it is not average current $i_o$ shown in Fig. 2a.*  As a result, there are substantial periods when the current and power flowing through the secondary winding circuit of the Steigerwald converter are zero.  That is not "substantially uninterrupted" power flow.[6]

Moving the energy storage capacitor (and the average current needed to charge it) from the output of the converter (as in prior art Fig. 1) to the input of capacitance-multiplying converter 20 (as in the Steigerwald system) is not a trivial change; it is the essence of the Steigerwald invention.  Steigerwald explains that this change from the prior art structure makes it possible to increase the voltage of the energy storage capacitor, which makes it "smaller for the same amount of stored energy."  Appx626(3:53-55).  This allows the size of the overall power supply to be reduced so that it can be incorporated into the radar module.

---

[6]  If the Fig. 4 converter supplied only average current $i_o$ (as in the prior art converter of Fig. 1), there would be insufficient power to supply the pulsed load because there is no energy storage capacitor on the secondary side of the Fig. 4 converter to make up the difference between the pulsed load and the average current.  Although Fig. 4 includes a capacitor $C_o$ on the secondary side, the specification makes clear that it is merely a filter capacitor "used for filtering switching noise and hence is not required to store substantial energy."  Appx626(3:39-41).

Appx625(2:4-7); Appx632(3:19-29).  The Steigerwald converters could not achieve their purported benefits if their output current was the average current $i_o$ shown in Fig. 2a.

The Board confused the prior art converter with the capacitance multiplying converter of the Steigerwald invention, incorrectly finding that the latter provides an average current $i_o$ to the load as shown in Fig. 2a.  The Board's decision should be vacated and remanded, so that SynQor can address the errors in the Board's new finding.

**B.    The Board Erred by Failing to Consider SynQor's Argument That the Alternative Steigerwald Embodiment Lacks "Substantially Uninterrupted" Power Flow Due to the Timing of the Synchronous Rectifiers.**

As explained above, this Court in the appeal of the '190 Vicor reexamination decision found that Steigerwald '090 (incorporating by reference Steigerwald '539) disclosed an alternative embodiment with synchronous rectifiers instead of diodes. In this reexamination proceeding, the Board relied on this same alternative Steigerwald embodiment to find the '021 claims unpatentable.  Appx28-29.  The Board and the Examiner, however, erred in concluding that this alternative embodiment had "substantially uninterrupted" power flow, an issue not presented in the '190 appeal, and failed even to consider SynQor's showing that it did not.

Below, SynQor explained that even if the diode embodiment (depicted in the sole Steigerwald '090 figure) had substantially uninterrupted power flow, that

would not mean that the alternative synchronous rectifier embodiment did as well because diodes and synchronous rectifiers operate differently.  Appx536-544. Diodes are always "on" and able to conduct current.  Synchronous rectifiers must be turned "on" to conduct current in the Steigerwald converters, and they do not conduct current when they are "off."  Synchronous rectifiers are turned "on" by applying a particular voltage to a control terminal, called a "gate."  Appx627(5:27-30).  Absent that gate voltage, the synchronous rectifier is "off."  When a synchronous rectifier is "off" in the Steigerwald converters, it cannot conduct current and thus power cannot flow through the secondary winding circuit of Steigerwald.  Appx540-541; Appx1371(2:35-37).  This creates an interruption in power flow.

Steigerwald '539 explains that in the synchronous rectifier embodiments, the synchronous rectifiers are not always "on" during their respective half-cycles, and that the "on" time varies based on the specific circuit topology.  Appx627(5:31-34).  For example, Steigerwald '539 explains that the "on-time" for the synchronous rectifiers "is shortest for the circuit configuration of FIG. 8," indicating that there are periods when the synchronous rectifiers are off. Appx627(5:31-33).  These periods (for one half-cycle) are shown in red in Fig. 10e of Steigerwald '539 below:



Appx624(Fig. 10e). During these off periods, no current can flow through the synchronous rectifiers, and thus no power can flow in Steigerwald's secondary winding circuit either.

In the proceedings below, Vicor did not dispute that Fig. 8 includes interruptions in power flow, or argue that they were insubstantial. Appx577-582. Instead, Vicor pointed only to the Fig. 9 embodiment of Steigerwald '539. Appx579-581. However, as SynQor explained, the Fig. 9 embodiment is not functional. Appx541.

Fig. 9 is reproduced below:



*FIG.9*

Appx623(Fig. 9).  As SynQor explained, when synchronous rectifier SRa is on, it connects output capacitor Co directly across the secondary winding of transformer T1, causing both T1 and Co to have the same voltage across them.  Appx541.  The gate terminal of SRa is connected to transformer T5, so the voltage of T5 must decrease in order to turn SRa off.  Appx541.  But here, T5 is connected across T1, and therefore its voltage is proportional to the voltage of T1.  Appx541.  Because T1's voltage is held constant by capacitor Co, it cannot change.  With T1's voltage unable to change, T5's voltage cannot change, and SRa cannot be turned off.  Appx541.  This inability to reduce the voltage across T1 and turn off SRa will cause the transformer to saturate and the output voltage to collapse to zero, making the converter inoperative.  Appx541.

43

Vicor argued that these functional problems with Fig. 9 could be overcome by adding leakage inductances that were never disclosed in either Steigerwald reference. Appx581. SynQor disagreed, because neither Steigerwald patent discloses any leakage inductance that would be substantial enough to solve the problem. And, Steigerwald specifically teaches to make leakage inductances "as low as possible." Appx626(3:65-66). The Board completely failed to address this disputed issue.

Instead, the Board made two other findings, both of which were erroneous. First, the Board stated that "the claim language requires the duty cycle of the *primary winding* to *cause* the uninterrupted power" and that SynQor did "not address this limitation adequately or persuasively and appears to be counter to the evidence…." Appx8-9 (emphasis in original). This was clearly erroneous. SynQor addressed this limitation when it explained (as discussed above) that the synchronous rectifiers on the secondary side in the alternative Steigerwald embodiment include "off" periods during their respective half-cycles which prevent continuous power flow in the secondary winding circuit. Appx537-538, Appx540-542. As a result, the duty cycle on the primary side cannot "cause" substantially uninterrupted power flow in the secondary winding circuit in this embodiment because the "off" periods of the synchronous rectifiers interrupt the power flow in the secondary winding circuit.

Second, the Board relied on its erroneous new finding (discussed in Section II.A.2 above) that average current $i_o$ in prior art Figs. 1 and 2a means that there is substantially uninterrupted power flow in the Steigerwald alternative embodiment. Specifically, the Board stated that Steigerwald "appears always to have at least some power load" because the converter "supplies average current $i_o$ to energy-storage capacitor $C_{out}$ and the load," specifically noting "line $i_o$ in Fig. 2a." Appx9. As discussed above, this finding was both completely new and entirely incorrect. Average current $i_o$ is a feature of the prior art converter that is not found in the converters of the Steigerwald invention, including the alternative synchronous rectifier embodiment. The Court should vacate and remand so that SynQor can respond to this new finding, as well as for the Board to consider the unresolved disputes identified above.

## III.    The Obviousness Rejections Should Be Reversed or Remanded.

The Board upheld the Examiner's obviousness rejections of dependent claims 22, 23, 25, 27-30, 49, and 50, which all depend on claim 1. Because (as discussed above) the decision on independent claim 1 should be vacated and remanded, the Court should also vacate and remand the decision on the dependent claims. Beyond the error with respect to claim 1, the Board's decision on the dependent claims rests on numerous additional errors and should be reversed in any event.

### A.    The Board's *Prima Facie* Obviousness Determinations Were Erroneous.

#### 1.    The Board Erred in Finding That Claim 49 Was *Prima Facie* Obvious.

Claim 49 adds the requirement to claim 1 that the non-regulated isolation stages "are switching regulators." The parties agree, and the Board found, that Steigerwald does not teach the use of switching regulators following a non-regulating isolation stage. Instead, Steigerwald teaches the use of linear regulators, as shown by reference numbers 50, 51 and 60, 61 in the sole figure of Steigerwald '090:



Appx629.  The Board found that it would have been obvious to replace the linear regulators in Steigerwald with switching regulators in view of Pressman.  This finding was error.

Having a switching regulator in the output path of Steigerwald "would have defeated the entire purpose" of the Steigerwald invention, as is clear from the Steigerwald patents and the testimony of SynQor's expert Dr. Dickens. Appx1049(¶28).  Steigerwald (as the Board acknowledged) is directed to a specialized power system – a system for pulsed loads, particularly "pulsed radar loads."  Appx29; Appx629(Abstract:1-3); Appx631(1:42-45).  In this system, Dr. Dickens explained, using a switching regulator in the output path instead of a linear regulator will create a major problem because a "switching regulator has a series inductor" that "will separate the load from the energy storage capacitor and interfere with the load's ability to draw a pulsed load from the capacitor." Appx1049(¶28).  Because the current in the inductor changes relatively slowly, the inductor will cause the "rise time" of the switching regulator's current to be "much longer," meaning that sufficient power will not be available to the load when it needs that power quickly at the rising edge of the pulse.  Due to the lack of sufficient power, "[t]he proper and intended operation of the converter therefore would not be achieved" using switching regulators.  Appx1049(¶28).

For this reason, the Steigerwald '090 patent specifically teaches **not** to use switching regulators in the output path.  Figure 1, the schematic of Steigerwald '090, has no inductors in the output path, and uses linear regulators 50, 51 and 60, 61, which lack inductors.  Appx630; Appx1041-1042(¶11).  Moreover, claim 1 mandates that the invention have "a path lacking inductors" seven times (elements a, d, e, h, i, j and k), and dependent claim 2 uses the same phrase four additional times.  Appx627-628(claims 1-2); Appx1041-1042(¶11).  Consistently, the Steigerwald '539 patent teaches to make the leakage inductance "as low as possible because such leakage inductance, which appears as an equivalent series inductance … on the transformer secondary side" causing "an equivalent dc voltage drop after rectification at the output."  Appx626(3:65-4:4); Appx1041-1042(¶11).

Dr. Steigerwald's own statements during the prosecution of the '090 patent provide further confirmation.  During prosecution, Dr. Steigerwald distinguished a prior art reference (Shimpo *et al.*) that had switching regulators by stating in no uncertain terms that his invention did ***not*** have switching regulators because switching regulators use inductors, which would interfere with the operation of his invention:

> In short, Shimpo et al. describes a plurality of synchronized switching regulators.  ***The claimed arrangement has no switching regulator at all***; it has the switched capacitance multiplier, cascaded with linear

voltage regulators.  It is noted that such ***switching regulators include series inductors, which adversely affect the pulse response by their inductance***, which introduces impedance into the current path.

…

***The claimed arrangement recites paths 'without inductors'*** (although it is recognized that all paths may have some inherent inductance), to emphasize that the pulse operation is inherent in the low impedance of the recited structure over a substantial bandwidth.

Appx2211-2221 at 2216 (emphases added).

Based on the clear teaching of Steigerwald, the Board has repeatedly found in other *inter partes* reexaminations involving the SynQor patents that Steigerwald teaches not to use switching regulators instead of linear regulators in the output path.  Examples of these rulings include:

- "We have reviewed Steigerwald '090 and find ***explicit prohibitions to the use of inductors*** in its conduction path."  Appx1526 (emphasis added).  *See* Appx1529 (referring to "a series inductor, which Steigerwald '090 cannot tolerate").

- "Based on the evidence of record, including Steigerwald '090, ***the use of any inductor*** in the conduction path of Steigerwald '090 ***would impede current pulses needed to power the radar, thereby frustrating its purpose***."  Appx1574 (emphases added).

- "Steigerwald '090 states a ***strict prohibition on the use of inductors*** in its conduction path."  Appx1614 (emphasis added).

- "We also note that the Dickens Declaration … provide[s] evidentiary support that ***inductors would not be desired*** in the Steigerwald '090 circuitry."  Appx1485 (emphasis added).

- "*[A]voidance of induction in the current path was critical to success* in Steigerwald '090. ***Switching regulators would add inductance***." Appx1643 (emphases added).

In the present reexamination, the Board also acknowledged in its initial decision that Steigerwald teaches against using inductors in the output path (Appx33-34), and pointed in its opinion on rehearing to "the undesirability of additional inductance" in the Steigerwald output path (Appx12).

Despite all of this, the Board found that a person of skill would find it acceptable to add an inductor because "[t]he express teaching in Pressman of enhanced efficiency, in our view, outweighs the undesirability of additional inductance." Appx12. The Board provided no explanation of how such "enhanced efficiency" would overcome the major technical problems caused by adding an inductor. Instead, the Board's explanation was limited to three conclusory sentences:

> However, Dr. Dickens also notes that Steigerwald '090 teaches away from resistance as well. Yet, the Federal Circuit determined that Steigerwald has an embodiment which includes controlled rectifiers in the capacitance multiplying converter of Steigerwald '090 sole Figure. This determination by the Federal Circuit weighs heavily against the Patent Owner's position.

Appx34 (internal citations omitted).

The Board here seems to be saying that because the alternative Steigerwald embodiment added some **resistance** (due to the use of controlled or synchronous

rectifiers), it would have been obvious to add an **inductor** too.   But adding an inductor interferes with the operation of Steigerwald in a way different than resistance. The Steigerwald pulsed radar requires power quickly at the start of each load pulse.  Adding an inductor in the output path will (as discussed above) cause the "rise time" of the output current to be "much longer," slowing it down so it cannot supply power as quickly as the load requires, and thereby "defeat[ing] the entire purpose" of the Steigerwald invention to supply a pulsed load. Appx1049(¶28).  Adding resistance will *not* create this problem because resistance does not slow down the delivery of power to the load; it simply increases the voltage drop across the resistive element.[7]  Appx1046(¶23(C)).  The Board never explains how the supposed additional efficiency provided by using switching regulators will overcome the fundamental problem with adding an inductor.  Nor does the Board identify anything in Pressman that teaches how to overcome these problems.

---

[7] This is because the voltage drop across a resistor is proportional to the current flowing through it, but the voltage drop across an inductor is proportional to the rate of change of the current flowing through it.  Appx934 (voltage across resistor equal to current times resistance (ESR)); Appx935 (voltage across inductor equal to rate of change of current through inductor (equation 8-16)).  The rate of change of current is much larger in the Steigerwald pulsed radar system because pulses cause very fast transitions in the load current, as shown in Fig. 2a of Steigerwald '539.

The Board points in cursory fashion to this Court's decision in the appeal of the '190 reexamination, but that decision never considered whether switching regulators could be used in Steigerwald's output path, and provides no support for the Board's conclusion. Nowhere in that decision did the Court find or even consider whether it would have been obvious to add an inductor to the output path (or a switching regulator having an inductor) in the Steigerwald alternative embodiment. The Court merely found that the combined Steigerwald reference "teaches substituting controlled rectifiers for diodes within the capacitance-multiplying converter 20" in Steigerwald '090. *Vicor,* 603 Fed. Appx. at 975. Nothing was said about adding even more resistance, much less an inductor.

Additionally, the Board ignored evidence showing that Pressman teaches away from the claimed invention. As Dr. Dickens explained, Pressman stresses the superiority and greater efficiency of a single-stage regulated converter, rather than a two-stage converter, such as Steigerwald. Appx1049-1053(¶¶30-40); Appx717; Appx720; Appx1000. Specifically, Pressman explains that the multi-stage approach had an efficiency of 59%, compared to 72% for the single-stage approach. Appx1052(¶36); Appx742; Appx746. Moreover, Pressman explains that a switching regulator (which he calls a "series-switch step-down regulator") provides "no advantage to be gained" over a linear regulator in the configuration (3-4) upon which the Board relies. Appx1052(¶36); Appx747.

The Board failed to provide a cohesive, much less persuasive, rationale for finding that the claims were *prima facie* obvious. To the extent the Court reaches these issues, it should overturn the rejections, or at a minimum remand for the Board to adequately address the issues.

### 2. The Board Erred in Finding That Claims 23, 25, 27-30, and 50 Were *Prima Facie* Obvious.

The Board also erred in finding that claims 23, 25, 27-30, and 50 would have been obvious in light of the prior art. Claim 29 adds the limitation that "the DC power source provides a voltage within the range of 36 to 75 volts" and claim 30 adds the further limitation that "the regulation stage output is of a voltage level to drive logic circuitry." Appx51. Claim 50 (like claim 49) includes the limitation that the regulation stages are switching regulators, and adds two additional limitations: (1) "the DC power source provides a voltage within the range of 36 to 75 volts"; and (2) "the regulation stage output is of a voltage level to drive logic circuitry." Appx115. Claims 23, 25, 28, and 29 include similar limitations. Appx51.

The Examiner found that these claims and voltage levels would have been obvious based on Steigerwald in view of "the knowledge of one of ordinary skill in the art," and the Board affirmed. Appx24. The Board's (and Examiner's) rationale was that "the voltages were in use in the telecom and computer industries" before the claimed invention, and a person of skill "would have

53

implemented those voltages as the result of routine design choice for a circuit for use in particular operating environments in which those voltages are used." Appx30.  In its Decision on Rehearing, the Board reiterated that "the voltage levels are a predictable result of a selection of known elements and values."  Appx13.

This analysis was improper.  The proper inquiry is not whether the claimed voltage levels were previously known; inventions, as here, are usually a combination of known elements.  Nor is the proper inquiry whether a person of ordinary skill "could" build a converter using these voltage levels with the Steigerwald topology.  The proper inquiry is whether it would have been ***obvious*** for a person of skill to do so.

It would not.  The Steigerwald patents were directed to a specific invention – a capacitance multiplication converter for a pulsed radar system.  Steigerwald wanted to make the converter smaller by reducing the size of the energy storage capacitor that stored energy for the pulses required to power the radar load.  To do this, he came up with the idea of increasing (or "multiplying") the capacitance of the energy storage capacitor by using a converter with a transformer and moving the capacitor from the output (as shown by $C_{out}$ in prior art Fig. 1 (Appx615)) to the input of his capacitance-multiplying converter 20 (as shown by Ce in Fig. 4 (Appx618)).  As Steigerwald explains, this increases the voltage across the capacitor, which in turn dramatically reduces the capacitor's size, because for a

given amount of energy the size of a capacitor decreases with increasing voltage, as depicted in Fig. 3 of Steigerwald '539.  Appx617(Fig. 3), Appx626(3:4-13).  For the Steigerwald capacitance multiplication invention to have value, however, the energy storage capacitor had to be at a high voltage.  The specification explains that "the energy-storage capacitor Ce is at 100 or more volts."  Appx626(3:48-49).

The Board points to no reason why a person of ordinary skill would reduce the input of Steigerwald to Dr. Schlecht's claimed range of 36-75 volts.  To the contrary, the evidence shows that a person of skill would be motivated ***not*** to do so.  As Dr. Dickens explains, reducing the input voltage of Steigerwald would diminish the "capacitance multiplication" effect that is the goal of the Steigerwald invention.  Appx1054(¶¶43-46).  For example, reducing the input voltage from 100 volts to 50 volts would reduce the capacitance multiplication effect by a factor of four, from 100 to 25, because the capacitance multiplication effect depends on the square of the transformer's turns-ratio (which would be reduced from 10:1 to 5:1).  Appx1054(¶46).  This would require the energy storage capacitor to be significantly larger, contrary to Steigerwald's purpose of reducing the size of the capacitor and thus the converter itself.  Appx1054(¶44); Appx632(3:19-29).  If anything, a person of ordinary skill would have been motivated to raise the input voltage to increase the capacitance-multiplying effect.  Similarly, there is nothing

in Steigerwald that teaches driving logic circuitry; its purpose is to supply a pulsed radar load.  Appx1041(¶¶7-9).

The Board's reasoning thus reduces to the proposition that it would be obvious to use any known voltage with any converter.  But that notion is completely at odds with the real world, where power converters are designed for specific purposes with voltages tailored to those purposes.  The claimed input range of 36-75 volts is known for use in telecom/computer systems, but the Board provides no reason why a person of ordinary skill would use that input voltage in the very different Steigerwald pulsed radar system, where it would undermine the very effect the Steigerwald invention sought to achieve.

Similarly, the Board provides no reason why a person of ordinary skill designing converters for telecom/computer equipment with a 36-75 volt input and outputs for driving logic circuitry would pluck out the Steigerwald invention from the sea of prior art.  The Steigerwald invention – capacitance multiplication to reduce the size of the energy storage capacitor – is directed to pulsed radar arrays, not telecom/computer systems.  Appx631(1:15-18); Appx1042-1043(¶¶15-18).  A person of ordinary skill trying to improve existing telecom systems would not have looked to the Steigerwald patents for a solution; doing so now is simply impermissible hindsight, as Dr. Dickens explained.  Appx1044(¶¶19-20).  *See Apple, Inc. v. Samsung Elecs. Co., Ltd.*, No. 2015-1171, ___ F.3d ___, 2016 WL

5864573, *12 (Fed. Cir. Oct. 7, 2016) (en banc) (upholding finding that "a skilled artisan would not have been motivated" to look to a reference disclosing "a wall-mounted touchscreen" to solve a problem with smartphones).

This Court recently underscored the dangers of a hindsight analysis of this kind. *WBIP, LLC. v. Kohler Co.*, 829 F.3d 1317 (Fed. Cir. 2016). In rejecting obviousness contentions, the Court explained that:

> Too often the obviousness analysis is framed as an inquiry into whether a person of skill, with two (and only two) references sitting on the table in front of him, would have been motivated to combine (or, in Kohler's view, could have combined) the references in a way that renders the claimed invention obvious. The real question is whether that skilled artisan would have plucked one reference out of the sea of prior art … and combined it with conventional [] elements to address some need present in the field …  Whether a skilled artisan would be motivated to make a combination includes whether he would select particular references in order to combine their elements.

*Id.* at 1337.  Here, there would have been no motivation for a person of ordinary skill to pluck the Steigerwald pulsed-radar reference out of the sea of prior art and seek to modify it to meet the needs of a telecom/datacom system.  Consequently, the Board's opinion fails to make out a *prima facie* case of obviousness and, to the extent the Court reaches this issue, it should reverse the rejections.

**B.    The Board Erred in Finding That the Compelling Evidence of Secondary Considerations Was Outweighed by the "Strong" Case of *Prima Facie* Obviousness.**

The powerful secondary considerations also weigh heavily in favor of nonobviousness.  As this Court has explained, secondary considerations "play an important role as a guard against the statutorily proscribed hindsight reasoning in the obviousness analysis" and "may often be the most probative and cogent evidence in the record."  *WBIP,* 829 F.3d at 1328; *Apple*, 2016 WL 5864573 at *12 (citation omitted).

**1.    The Board Correctly Found Compelling Evidence of Secondary Considerations.**

The objective indicia of nonobviousness are overwhelming, including commercial success, long-felt but unmet need, initial skepticism of others, praise by the industry, and copying by SynQor's competitors.  The evidence is summarized below.

**Commercial Success**:  Millions of infringing bus converters were sold and incorporated into end products that practiced the claimed invention of the '021 patent.  Appx1035(¶43).  At the *SynQor I* infringement trial, SynQor demonstrated that 4,590,992 units of infringing bus converters were sold worldwide between July 7, 2006 and November 1, 2010 alone (1,961,215 in the U.S.).  Appx2174. The jury found that these bus converters had no substantial noninfringing use and that there were no noninfringing alternatives.  Appx1035(¶42).  *See SynQor, Inc. v.*

*Artesyn Techs., Inc.*, No. 2:07-cv-00497, 2011 WL 238645, *8 (E.D. Tex. Jan 24, 2011) ("the jury in the [*SynQor I*] case found that SynQor was entitled to lost profits, which based on the damage model presented at trial, implies that the [*SynQor I*] jury believed that there were not any non-infringing alternatives."). As a consequence, the jury awarded SynQor more than $95 million in damages. Appx1795-1803.

**Long Felt But Unmet Need**:  SynQor presented extensive evidence that the patented technology addressed a long-felt need in the telecom/computer industry: the need for a highly-efficient, compact power converter system that could provide a variety of output voltages to drive logic circuitry on a load board.  This need was documented in numerous articles.  Appx1826-1829; Appx1847; Appx1856; Appx1861; Appx1867; Appx1870; Appx1881.  Witnesses at the *SynQor I* trial, including representatives of SynQor's competitors and their customer Cisco, described this need, and how it was satisfied by the claimed inventions. Appx1184-1185(101:25-104:24); Appx1192(130:24-131:25); Appx1194(139:12-140:3); Appx1195-1196(145:15-146:12); Appx1197(152:9-153:14); Appx1199-1200(159:25-164:7); Appx1203(176:2-16).

**Initial Skepticism**:  Others were skeptical of the claimed inventions when first learning about them, because the inventions bucked the conventional wisdom that single-stage conversion was preferable to two-stage conversion.  One

competitor, Bel Fuse, explained that the claimed invention was "counter-intuitive to the one who focuses primarily on the fact that we have introduced an extra stage of conversion" and defied the "common assumption" that a system will "have much lower total efficiency due to the addition of an extra stage of conversion." Appx1913-1914. Another competitor, Murata, acknowledged in the *SynQor I* trial that the common view was that separating isolation and regulation "almost surely would cost more in dollars, efficiency, and board space." Appx1918; Appx1289(117:20-118:5). This was consistent with Dr. Schlecht's testimony about the conventional wisdom in the industry. Appx1168(34:9-36:17), Appx1170-1171(45:14-47:4).

**Industry Praise**: The claimed IBA inventions prompted a flood of praise from across the industry. For example, a 2007 article discussed the development of board-mounted power systems, and referred to unregulated IBA systems covered by the claims as the "ultimate dream," providing "higher efficiency in less space at lower cost." Appx1925. Bel Fuse explained that unregulated IBA "has substantial merit," using "less space" at a "lower cost." Appx1914. An engineer at National Semiconductor described unregulated IBA as "a revolution in the distributed-power architecture" that was a "fundamental change" from earlier designs. Appx1929, Appx1931. A professor at Virginia Polytechnic described unregulated IBA as "one of the hottest products" for server, telecom, and network

applications.  Appx1960.  And, in May 2004, EDN, an electronics industry

magazine, published a special issue on power technology including an article

describing the rise of unregulated IBA as a "'new' architecture" and stating that

manufacturers expect "IBA to dominate DPAs in the future as the power

architecture of choice for high-end electronics."  Appx2019.

**Copying**:  Competitors and customers copied SynQor's patented inventions.

Dr. Schlecht introduced Cisco, Hewlett-Packard, and other customers to the

claimed inventions in the early 2000s.  Appx1132-1135(73:3-85:11);

Appx1184(99:25-101:20), Appx1186(107:13-109:15).  Cisco then widely adopted

the inventions (Appx1187(111:21-23), Appx1192-1193(133:6-134:8), and

SynQor's competitors developed their unregulated converters at the request of

Cisco and other customers.  *See* Appx1215-1225(17:2-57:9) (Dr. Leeb describing

"the significant efforts to copy … SynQor products"); Appx2105-2116 (slides used

in conjunction with foregoing testimony); Appx1220-1222(40:12-46:16)

(discussing HP's request to Delta for a bus converter and Delta obtaining SynQor

datasheets, pictures, and a sample SynQor converter); Appx1196(146:22-147:21)

(Bel Fuse witness explaining suppliers' work with Cisco to develop IBA

converters); Appx1201(168:17-169:8) (Bel Fuse witness discussing email

explaining that when developing its bus converters for HP, "[t]he only spec we

ever got on this was the SynQor datasheet"); Appx1204-1205(180:13-183:22)

(Cherokee witness describing review of SynQor datasheets in developing bus converters); Appx1312(10:6-11:3) (Astec obtained and analyzed samples of SynQor bus converters when designing its unregulated bus converters).

The Board here properly credited the evidence of secondary considerations, finding that it "has significant weight." Appx18. This is in line with the Board's previous decisions finding the existence of secondary considerations of nonobviousness. Appx1486-1492; Appx1536-1548; Appx2273-2285; Appx1585-1602; Appx1619-1628; Appx1644-1648; Appx1679-1686. It is also consistent with this Court's determination on appeal in *SynQor I*. 709 F.3d at 1377.

### 2. The Board Correctly Found a Nexus Between the Secondary Considerations and the Claims at Issue.

The Board also correctly determined that there is a nexus between the evidence of secondary considerations for the claims at issue and that "the evidence is entitled to weight." Appx16.

As this Court has held, "there is a presumption of nexus for objective considerations when the patentee shows that the asserted objective evidence is tied to a specific product and that product is the invention disclosed and claimed in the patent." *WBIP*, 829 F.3d at 1329 (internal quotation marks and citation omitted). For commercial success, for example, the presumption is established where the patentee shows "significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent." *J.T. Eaton & Co.,*

*Inc.*, *v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997); *see also*

*Crocs, Inc. v. Int'l Trade Comm'n* , 598 F.3d 1294, 1310-11 (Fed. Cir. 2010).

Once that showing has been made, the party challenging validity must "prove that

the commercial success is instead due to other factors extraneous to the patented

invention, such as advertising or superior workmanship." *Eaton*, 106 F.3d at 1571;

*see also WBIP*, 829 F.3d at 1329.

*SynQor I* established that products that were commercially successful (and

also the subjects of other secondary considerations) embodied the invention of the

dependent claims of the '021 patent at issue here.  Although those specific claims

were not considered by the jury, the jury found infringement of other claims that

included the same limitations.  Specifically, the jury found that products that

infringed claim 1 of the '021 patent also infringed claim 2 of the '190 patent

which, like dependent claim 49 at issue here, recites that "the regulation stages are

switching regulators."  Appx1771-1789, Appx1804-1824.  Similarly, the jury

found that products that infringed claim 1 of the '021 patent also infringed claim

29 of the '021 patent, which recites an input voltage "within the range of 36 to 75

volts," and claim 30 of the '021 patent, which recites that "the regulation stage

output is of a voltage level to drive logic circuitry," limitations present in other

dependent claims at issue here.  Appx1771-1789, Appx1804-1824.  This evidence

creates a presumption of nexus.  *See WBIP*, 829 F.3d at 1329.

This presumption is strengthened by the close link between the commercially successful products and the specific limitations of the asserted claims.  For example, all of the products found to infringe used switching regulators (as claimed in dependent claim 49) rather than linear regulators. Appx1771-1789; Appx1804-1824.  All of the commercially successful products also had an input within the range of 36-75 volts and an output for driving logic circuitry.  *Id.*

The presumption of nexus stands unrebutted.  As the Board correctly found, "Vicor has not submitted any persuasive evidence rebutting SynQor's evidence that the secondary consideration evidence is attributed to anything other than the merits of the claimed invention."  Appx15.  Thus, the Board correctly found that "there is a nexus between the evidence of secondary considerations for these dependent claims where the claim limitations were infringed, and that the evidence is entitled to weight."  Appx16.

Vicor's only response was to rely on a mistaken assertion of law.  Vicor argued that there was no nexus because SynQor did not show that the commercial success (and other secondary considerations) resulted ***solely*** from novel limitations not present in the prior art.  Appx238-245; Appx597.  According to Vicor, a patentee "must demonstrate a nexus to particular claim elements" that are "novel" in the art, and cannot rely on elements "found in the prior art."  Appx238-239.

64

This Court squarely rejected Vicor's view in its recent *WBIP* decision:

> We further reject Kohler's categorical claim that objective evidence ***must be tied exclusively to claim elements that are not disclosed in a particular prior art reference*** in order for that evidence to carry substantial weight. ***Requiring patentees to prove that objective evidence is tied to a specific claim element—and only that claim element—runs counter to the statutory instruction that the obviousness analysis involves determining whether the claimed invention as a whole would have been obvious***. This is especially true for situations like those at issue here, where the claimed invention is, admittedly, a combination of elements that were known individually in the prior art. Commercial success, for example, may be linked to an individual element or, in other circumstances, it could be linked to the inventive combination of known elements.

829 F.3d at 1331-32 (emphases added) (internal quotation marks and citations omitted). Similarly here, Vicor's argument that SynQor must specifically tie the objective indicia solely to elements missing from the prior art, rather than to the invention as a whole, is wrong, and the Board properly rejected it.

### 3.     The Board Erred in Finding That the Secondary Considerations Were Insufficient to Overcome the "Strong" Case of *Prima Facie* Obviousness.

Despite the compelling evidence of secondary considerations and nexus, the Board found the secondary considerations "insufficient to overcome the strong case of obviousness." Appx18. The Board's reasoning was simply a regurgitation of its previous inadequate analysis. As to claim 49, the Board stated that "as noted above, Pressman creates a strong incentive for improving efficiency by replacing

the linear regulators with switching regulators." Appx16-17. As to the voltage-level claims, the Board stated that "[t]he voltage values are firstly known, and secondly, easily achievable with known components resulting in predictable results, as discussed above." Appx17.

As explained in Section II.A.1, Steigerwald is targeted at a system for supplying a pulsed load, such as a radar array. Replacing the linear regulators with switching regulators would add an inductor, which would frustrate the ability of the Steigerwald invention to supply the pulsed load. This is why Steigerwald expressly teaches against using an inductor in the output path, as the Board itself found in other reexaminations. Nothing in Pressman suggests how to overcome these problems, and the Board points to nothing. Nor was there anything in this Court's decision in the '190 reexamination that addressed whether an inductor could be added to Steigerwald. Not only is there no motivation to make this substitution, but Steigerwald specifically teaches against it. As discussed above, the Board's conclusions on the voltage-level claims also suffers from serious infirmities.

Given the weaknesses in the Board's obviousness findings, the secondary considerations in this case are particularly important here to "guard against the statutorily proscribed hindsight reasoning in the obviousness analysis." *See WBIP*, 829 F.3d at 1328. Both the Board and this Court have previously credited the

strong evidence of secondary considerations in this case, "including commercial success, industry recognition, initial (pre-invention) skepticism of experts, unexpected results, and copying by competitors." *SynQor* I, 709 F.3d at 1377. *See* Appx16. As in this Court's recent en banc *Apple v. Samsung* opinion, this evidence weighs strongly in favor of nonobviousness. For example, as this Court explained in *Apple*, "[e]vidence that the industry praised a claimed invention or a product that embodies the patent claims weighs against an assertion that the same claimed invention would have been obvious" because "[i]ndustry participants, especially competitors, are not likely to praise an obvious advance over the known art." *Apple*, 2016 WL 5864573 at *12. Similarly, long-felt need weighs in favor of nonobviousness "because it is reasonable to infer the need would not have persisted had the solution been obvious." *Id.* at *15. Here, the secondary considerations are "particularly strong" and "powerfully weigh in favor of validity." For example, the Pressman book had been around for decades at the time of the claimed invention. If it would have been obvious to make a system like Steigerwald but with switching regulators instead of linear regulators, someone presumably would have done so. The Board erred in failing to give due weight to the compelling secondary consideration evidence in this case, and erred in finding that it was insufficient to overcome the flawed arguments for obviousness. The Board's opinion should be reversed on this basis as well.

## CONCLUSION

For the foregoing reasons, this Court should reverse the Board's decision holding the challenged claims unpatentable. At a minimum, the Court should vacate and remand for the Board to reconsider its decision.

Date: October 28, 2016                    Respectfully submitted,

                                          /s/ Thomas D. Rein
                                          Thomas D. Rein
                                          Constantine L. Trela, Jr.
                                          Russell E. Cass
                                          Bryan C. Mulder
                                          Sidley Austin LLP
                                          One South Dearborn
                                          Chicago, IL 60603
                                          Telephone: (312) 853-7000

                                          *Counsel for Appellant SynQor, Inc.*

# ADDENDUM



Uɴɪᴛᴇᴅ Sᴛᴀᴛᴇs Pᴀᴛᴇɴᴛ ᴀɴᴅ Tʀᴀᴅᴇᴍᴀʀᴋ Oғғɪᴄᴇ

**UNITED STATES DEPARTMENT OF COMMERCE**
**U.S. Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
      P.O. Box 1450
      Alexandria, Virginia 22313-1450
      www.uspto.gov

| APPLICATION NO./ CONTROL NO. | FILING DATE | FIRST NAMED INVENTOR / PATENT IN REEXAMINATION | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 95/001,637 | 05/31/2011 | 7,272,021 | |

GREENBLUM & BERNSTEIN, P.L.C.
1950 ROLAND CLARKE PLACE
RESTON, VA 20191

| EXAMINER |
|---|
| Nguyen, Linh |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 05/02/2016 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

MOD PTOL-90A (Rev.06/08)

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————————

VICOR CORPORATION
Requester

v.

SYNQOR, Inc.
Patent Owner and Appellant

———————————————

Appeal 2014-007587
Reexamination Control 95/001,637[1]
Patent No. US 7,272,021 B2[2]
Technology Center 3900

———————————————

Before JAMES T. MOORE, STEPHEN C. SIU, and
DENISE M. POTHIER, *Administrative Patent Judges*.

MOORE, *Administrative Patent Judge*.

DECISION ON REHEARING

I. INTRODUCTION

On May 5, 2015 this Board issued a Decision ("Dec.") which stated

that it affirmed the decision of the Examiner rejecting claims 1, 9, 15, 16,

21–27, 29–31, 39, 45–47, 49, and 50.  Dec. 1–2.  Patent Owner SynQor, Inc.

———————————————

[1] Filed by Vicor Corporation on May 31, 2011.
[2] Issued September 18, 2007 to Martin Schlecht and Richard Farrington, and
assigned to SynQor, Inc.  (the "'021 patent").  The '021 patent issued from
Application 11/407,699, filed November 23, 2006.

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

("Patent Owner") filed a timely request for rehearing ("Reh'g Req.").  On July 6, 2015 Requester Vicor Corporation ("Requester") filed comments on the request for rehearing ("Comments").

The Request for Rehearing is granted-in-part.

We grant the Request to the extent that it seeks correction of the status of the claims.  Reh'g Req. n.1, p. ii.  It appears that claims 16 and 46 were erroneously listed in both the Right of Appeal Notice[3] and Patent Owner's Appeal Brief[4] as rejected.  While this error is not something the Board overlooked, it is an apparent error resulting from the Action Closing Prosecution.  The claims which were rejected, and which rejections were affirmed, should read "1, 9, 15, 21–27, 29–31, 39, 45, 47, 49, and 50."  The Decision is so amended.

We further grant the Request insofar as we have reconsidered the decision, and specifically further reconsidered the evidence of secondary considerations as discussed below.  However, we decline to change our ultimate determination that the Examiner did not err in rejecting the claims.

## II.  ISSUES ON REHEARING

*A.  The rejection of Claims 1, 9, 15, 21, 24, 26, 31, 39, 45, and 47 under 35 US.C. § 102(b) as being anticipated by Steigerwald '090.*

### 1.  Current and Power Flow

Independent claims 1, 31, and 47 of the '021 patent respectively recite the following element:

> a control circuit which controls duty cycle of the primary winding circuit, *the duty cycle causing substantially*

---

[3] "RAN" at coversheet.
[4] "PO App. Br." at 2.

2

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

> *uninterrupted flow of power* through the primary and
> secondary winding circuits during normal operation

'021 Patent, 6:32–37 (emphasis added).

> controlling duty cycle of the power to the primary winding, *the
> duty cycle causing substantially uninterrupted flow of power*
> through the primary and secondary windings during normal
> operation

*Id.* at 8:1–4 (emphasis added).

> means for controlling duty cycle of the power to the primary
> winding, *the duty cycle causing substantially uninterrupted
> flow of power* through the primary and secondary windings
> during normal operation to provide an isolated output without
> regulation

*Id.* 8:50–54 (emphasis added).

The Examiner found that Steigerwald '539[5] described a two-stage
power converter, having a regulation stage followed by an isolation stage.
The isolation stage includes two transformers that operate in opposite phase,
each at a complementary 50% duty cycle. As a consequence, "the energy-
storage capacitor $C_e$ is always transformer-coupled to the dc output." Req. 2
(quoting Steigerwald '539, 3:33–39); *see also* Req. 6–7. Thus, the Examiner
concluded there was substantially uninterrupted power flow. *Id.*

In the Brief on Appeal, Patent Owner argued that the Steigerwald
patents are specifically directed to radar applications, which are
characterized by the typical pulsed load as illustrated in Steigerwald '539
Figure 2. PO App. Br. 23.

---

[5] The anticipation rejection incorporates the teachings of Steigerwald '539.
We refer to the incorporated disclosure as "Steigerwald '090/'539."

3

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

We were not persuaded by this argument and affirmed the rejection. Decision 9–10.

The Patent Owner, in the Request for Rehearing, urges that "the PTAB's conclusion [regarding substantially uninterrupted] is erroneous." Reh'g Req. 2. As we understand the argument, Patent Owner asserts that (1) there is no description of current flow, and therefore of power; (2) the power flow in the Steigerwald '090/'539 system is repeatedly interrupted; and (3) the degree of interruption of power flow in Steigerwald '090/'539 system is indeterminable. Reh'g Req. 1, 3, 5, and 7. Consequently, it is urged, we erred in affirming the finding that Steigerwald '090/'539 system anticipated claims 1, 9, 15, 21, 24, 26, 31, 39, 45, and 47.

*"Substantially Continuous Power Flow"*

The finding that there was substantially continuous power flow was adopted by the Examiner from the Reexamination Request filed May 31, 2011, page 13. RAN 4–5. Patent Owner then urged on appeal that the Steigerwald patents were silent on current flow, and that they did not teach that power flow is substantially uninterrupted. PO App. Br. 22–23. We were directed to A214, 13–16 and A215, 10–11 in support thereof. A214 (i.e., Appendix numbers 214 and 215 to the Appeal Brief) is a Response filed by the Patent Owner October 31, 2011, during prosecution, which Response contains three additional pages of argument concerning the flow of power in the Steigerwald '090 patent.

Patent Owner urged in the October 31, 2011 response that Steigerwald '090 does not describe uninterrupted power flow because "being coupled" does not inherently require that any power flows through the isolation stage.

4

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

In other words, even when the capacitor $C_e$ is connected, or coupled, to the load, this does not mean that power is flowing from $C_e$ through the primary and secondary transformer windings and circuits of the capacitor-multiplying converter to the load.  Ex. A 214, October 31, 2011 Response, page 13.

Patent Owner urged, by reference to Figure 2a of the Steigerwald '539 patent, that the power flowing through the capacitance-multiplying converter and to the radar application load is zero for a "great deal of the time."  *Id.* Patent Owner then concluded that the Steigerwald patents do not show an isolation stage through which there is a "substantially uninterrupted flow of power" during normal operation, required in all of the '021 claims.  *Id.* at 14. This argument relies principally on the pulsed nature of the primary load for which Steigerwald uses the circuitry.

Patent Owner further discounted the explicit description of "bias voltages" because "nothing expressly or inherently requires these voltages to have loads that draw a substantially uninterrupted power flow."  *Id.* at 15. That argument relies upon the Schlecht Declaration at paragraph 26, which alleges that Streigerwald '090 suggests that, for the multiple output voltages, "all of them could be pulsed loads."  Dr. Schlecht relies upon Steigerwald '090, column 3, lines 19–23.

We reproduce the cited portion of Steigerwald below:

> As yet another advantage, pulse energy is stored in a high-voltage capacitor rather than at the substantially lower utilization voltages, thereby minimizing capacitor volume, allowing substantial energy storage to be in the module itself.

Steigerwald '090 3:19–23.

5

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

To begin, we observe that the evidence of record reveals that Dr.
Schlecht has misinterpreted the Steigerwald '090 description. The cited
section applies to miniaturization — i.e. minimizing capacitor volume
because a high voltage capacitor can store more energy in a smaller space
than on the lower voltage utilization side. This descriptive section applies to
the pulsed loads; we find that it does not suggest that the bias or control
loads are also pulsed.

Also, we turn to Figure 2a of Steigerwald '539, brought more fully to
our attention by Patent Owner (PO App. Br. 22 (citing PO App. Br., Evid.
App'x, Ex. A214)) and reproduced below.



FIG. 2a
PRIOR ART

Figure 2a describing average and conventional power systems.

It is true that there is an intermittent full load for a time period "t"
while the radar transmission occurs, as argued by the Patent Owner.
However, in raising this issue, we observe that Patent Owner does not
discuss the import of the line marked $i_o$ in Figure 2a. Steigerwald describes
Figure 2a thusly:

6

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

> FIG. **2***a* graphically illustrates the *average* and load currents for
> the conventional power system of FIG. **1**;

Steigerwald '539 2:17–18 (emphasis added).

> The power converter receives an input current in and supplies
> *average* current $i_o$ to energy-storage capacitor $C_{out}$ and the load.

Steigerwald '539 2:55–57 (emphasis added).

In other words, it appears on this record that Steigerwald describes its embodiments include a continual average current without substantial interruption to run control circuitry.

Appendix Number A215 is a paper containing SynQor's Comments filed March 12, 2012. Pages 10 and 11 contain an argument that the capacitor charges from $V_{in}$ but discharges in a short pulse. SynQor Comments March 12, 2012, 10. Patent Owner also urged that the duty cycle of the primary winding need not be the sole cause of the power flow, just a cause. *Id.* at 11.

We are unpersuaded by these positions for the reasons noted above concerning Figure 2a and the average power described therein.

On rehearing, Patent Owner also urges that the 50% duty cycle applies "only to the *diode* embodiment of Fig. 1 of Steigerwald '090 and the operation of the primary side transistors, Qa and Qb in that embodiment. The cited statements in *both* the Steigerwald '090 and the '539 say nothing about the duty cycle of the *synchronous rectifiers*." Reh'g Req. 2.

We observe that the claim language requires the duty cycle of the *primary winding* to *cause* the uninterrupted power. This limitation appears to be what Steigerwald actually describes. Patent Owner's argument does

7

not address this limitation adequately or persuasively and appears to be counter to the evidence of record in this proceeding.

Moreover, as noted above, "normal operation" of Steigerwald '090 also appears always to have at least some power load, while charging the capacitor $C_e$, which is always connected to the output of the secondary winding circuit. Steigerwald '090 2:53–56. Steigerwald '539 observes that "[t]he power converter receives an input current in and supplies average current $i_o$ to energy-storage capacitor $C_{out}$ and the load." Steigerwald '539 2:55–57 (italics in original). Note line $i_o$ in Figure 2a. As a consequence, we are not persuaded that Steigerwald '539 does not describe a continuous power flow.

We have considered the attorney argument concerning interruption in the boundary between each half cycle (Req. Reh'g. 5–7) and the degree of interruption of power flow (Req. Reh'g 7–9). However, in view of the description of Steigerwald '090 as noted above, including that describing average current, we are unpersuaded that we have overlooked or misapprehended any facts or arguments.

We remain unpersuaded by Patent Owner's arguments.

*B. The rejection of Claims 22, 23, 25, and 27–30 under 35 U.S.C. § 103(a) over Steigerwald '090*

*Uninterrupted Power Flow*

Patent Owner urges that the obviousness rejections should be reversed because the anticipation rejection should be reversed, and that "[n]either the PTAB nor Vicor have made any obviousness arguments based upon the 'substantially uninterrupted power flow' limitation." Reh'g. Req. 9.

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

As Patent Owner has not pointed to any further particular allegation of error, or fact or law we misapprehended or overlooked, we find this contention also to be unpersuasive.

*Teaching Away and PTAB Prior Decisions*

Patent Owner, relying on multiple decisions of this Board, states that "[t]he PTAB has consistently concluded that the use of synchronous rectifiers is contrary to the purpose of Fig. 1 of the Steigerwald '090 patent." Reh'g Req. 10. Patent Owner lists several decisions indicating that there were technical difficulties, and urges that the alternative embodiment was not desirable. As a consequence, it is urged, we "failed to show that a person of ordinary skill in the art would have a reason to modify this [Figure 1] embodiment to arrive at the invention recited in the dependent claims at issue." *Id.* at 12.

The panel did not overlook those decisions; those prior decisions were made prior to a March 13, 2015 Federal Circuit decision determining there was an embodiment in Steigerwald '090 incorporating synchronous rectifiers in the conduction path. With the determination that Steigerwald '090 described an alternative embodiment incorporating the description in Steigerwald '539, the facts underpinning the understanding of the prior art have necessarily shifted.

We, therefore, are unpersuaded that the panel overlooked or misapprehended its other, prior decisions.

*Claim 49*

Claim 49 recites:

> 49. A power converter system as claimed in claim 1, wherein the regulation stages are switching regulators.

9

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

Patent Owner urges that the Board overlooked that Steigerwald's statements, made during the prosecution of the Steigerwald '090 patent, are "legally binding clarifications of the embodiments disclosed in Steigerwald '090, including the Steigerwald '090/'539 alternative embodiment." Reh'g Req. 13. According to Patent Owner, a person of ordinary skill in the art reading the Steigerwald '090 patent and prosecution history would understand that none of the embodiments disclosed in Steigerwald '090 is permitted to have an inductor in the non-isolating regulation stages, including the use of switching regulators. *Id.*

We previously considered this argument in our Decision. The Examiner found that Pressman describes the use of switching regulators at the output stage. RAN 18. Motivation is said to be found in Pressman on page 81, where it is stated that "[i]f the larger component count of a switching postregulator (Sect.1.2) is acceptable, even higher efficiencies can be achieved." *Id.* at 20. *See also* Requester Comments November 20, 2011, pages 18–20, which were adopted.

Patent Owner states that we misapprehended the impact of the Federal Circuit's decision on this claim. Reh'g Req. 12. Specifically, it is urged that the Federal Circuit's decision only determined there was an embodiment which included a controlled rectifier. *Id.* One of ordinary skill in the art, therefore, would have been aware that regulation stages used linear regulators, instead of switching regulators, to minimize inductance. *Id.* at 13.

We have considered this argument in view of the evidence of record and the arguments now raised in the rehearing request. We have

10

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

reconsidered our decision, but decline to change it based upon this argument.
The express teaching in Pressman of enhanced efficiency, in our view,
outweighs the undesirability of additional inductance, when considered in
view of the Steigerwald alternative embodiment, as noted in our previous
decision.

*Claim 50*

Claim 50 stands rejected under 35 U.S.C. § 103(a) over Steigerwald
'090 (incorporating Steigerwald '539) in view of Pressman and Admitted
Prior Art in U.S. Pat. No. 5,999,417.  Requester November 30, 2011
Response, pp. 21–22.

Claim 50 reads as follows:

> 50. A power converter system as claimed in claim 1
> wherein the regulation stages are switching regulators, wherein
> the DC power source provides a voltage within the range of 36
> to 75 volts, and wherein the regulation stage output is of a
> voltage level to drive logic circuitry.

The Examiner found that these recited voltage levels were admitted
prior art.  Requester November 30, 2011 Response, pp. 21–22.  In addition,
the Examiner found that a person of ordinary skill could have combined the
known elements and achieved the predictable results of input and output
voltages.  *Id.*

Patent Owner urges that the panel misapprehended the cited portion of
SynQor's '417 patent.  Specifically, Patent Owner urges that because the
discussion of voltages is not in the Background section, it does not state such
voltages were known in a two-stage power converter system having the
characteristics of claim 50.  Reh'g Req. 15–16.

11

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

We are not persuaded by this argument.  We observe that Patent
Owner does not take the position that these voltage levels were not known in
the prior art.  Indeed, it would appear that they were well known, as the
Specification observes that "[t]he nominal values and ranges of the input and
output voltages, as well as the maximum power handling capability of the
converter, depend on the application."  '021 Patent 1:29–31.  As the
Requester notes, "[w]here a claim element is known in the art, and can be
implemented as a matter of ordinary skill with predictable results, the claim
is obvious."  Comments 23; *see also KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S.
398, 416 (2007).

Accordingly, we have not misapprehended or overlooked these
arguments, and find no error in the Examiner's determination that the
voltage levels are a predictable result of a selection of known elements and
values.

*Claims 29 and 30; Claims 22, 23, 25, 27 and 28*

Patent Owner makes similar arguments for these claims as above for
claim 50.  We are unpersuaded that we misapprehended or overlooked any
fact or conclusion as discussed previously.  Patent Owner also urges that the
Examiner erred in failing to consider voltage levels for radar applications, as
opposed to those used to drive logic circuitry.  Reh'g Req. 18, 19.  This
argument also fails to address the use of voltages in Steigerwald '090 to
drive control circuitry.  Accordingly, we are unpersuaded of error.

*C. Secondary Considerations*

In 1966, the Supreme Court in *Graham v. John Deere Co.*, 383 U.S. 1,
(1966) interpreted and applied section 103, stating:

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

> Under 103, the scope and content of the prior art are to be
> determined; differences between the prior art and the claims at
> issue are to be ascertained; and the level of ordinary skill in the
> pertinent art resolved.  Against this background, the
> obviousness or nonobviousness of the subject matter is
> determined.  Such secondary considerations as commercial
> success, long felt but unsolved needs, failure of others, etc.,
> might be utilized to give light to the circumstances surrounding
> the origin of the subject matter sought to be patented.

383 U.S. 1, 17–18 (1966)

The Federal Circuit has determined that only after considering the

four *Graham* criteria together can the decision maker make the legal

determination of whether the invention is nonobvious.  *Panduit v. Dennison*

*Manufacturing Co.*, 810 F.2d 1561, 1570 (Fed. Cir. 1986), *cert denied*, 481

U.S. 1052 (1987).  A long-felt need and post-invention commercial success

can tip the balance in favor of non-obviousness, both in the courts and at the

PTO.  *Eibel Process Co. v. Minnesota & Ontario Paper Co.*, 261 U.S. 45

(1923); *Carnegie Steel Co. v. Cambria Iron Co.*, 185 U.S. 403 (1902); *The*

*Barbed Wire Patent*, 143 U.S. 275 (1892); *Webster Loom v. Higgins*, 105

U.S. 580 (1881).

Patent Owner urges that the Board "wrongly concludes that the

secondary considerations evidence of record relates principally to features of

the independent claims rejected under anticipation, as opposed to the

dependent claims rejected under obviousness.  The PTAB erroneously

concludes, according to the Patent Owner, that SynQor has not shown a

'nexus' to the 'dependent claim features.'"  Reh'g Req. 20.

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

More specifically, Patent Owner urges that secondary considerations apply to claims 49, 50, 25, 29, and 30, as certain systems were found to infringe those claims specifically.  Reh'g Req. 21.

We agree with Patent Owner that secondary considerations can apply with equal force to dependent claims.  Reh'g Req. 19.  Our prior decision is amended by deleting the earlier discussion concerning secondary considerations and replacing it with the following discussion, upon our renewed consideration of the evidence.

Patent Owner urges that the evidence of secondary considerations is commensurate in scope with the dependent claims at issue and it is legal error not to consider such evidence.  Patent Owner further urges that the record establishes a nexus between the evidence of secondary considerations and the merits of the claimed invention; to wit, Patent Owner asserts (1) multiple infringing unregulated intermediate bus architecture ("UIBA") systems fall within the scope of the dependent claims at issue; (2) the infringing UIBA systems enjoyed significant commercial success, fulfilled a long felt need and were praised by the industry; (3) there is a nexus between the secondary consideration evidence and the dependent claims; and (4) Vicor has not submitted any persuasive evidence rebutting SynQor's evidence that the secondary consideration evidence is attributed to anything other than the merits of the claimed invention.  Reh'g Req. 21.

Patent Owner asserts that the Jury Verdict Form from the related litigation, the product datasheets as well as expert testimony, establish that the unregulated intermediate bus architecture systems found to infringe

14

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

claim 1 of the '021 patent also include switching regulators as the regulation stages and thereby also infringe claim 49 of the '021 patent.  Reh'g Req. 22.

We accept the evidence that the twelve products listed in the Appendix of the Jury Verdict Form infringe claim 49 of the '021 patent as outlined in the Request for Rehearing pages 22–24.  We accept the same for claim 50 (Reh'g Req. 24–25) and as stated for claims 25, 29, and 30 (*Id.* at 25).

We additionally accept that the evidence establishes that the infringing products were commercially successful, for the reasons set forth in pages 25 and 26 of the rehearing request.

We also accept that there was some evidence of industry praise and a need for the power converters, although this evidence is somewhat less persuasive than the commercial success evidence due to its lack of precision as to what constitutes unregulated intermediate bus architecture and the praise, versus the scope of the claims.  Reh'g Req. 26–27.

We further accept the position that there is a nexus between the evidence of secondary considerations for these dependent claims where the claim limitations were infringed, and that the evidence is entitled to weight. Reh'g Req. 28–30.

We look to the differences between the claimed subject matter and the prior art.

Claims 1, 9, 15, 21, 24, 26, 31, 39, 45, and 47 are anticipated, and as a consequence this evidence is inapplicable to those claims.

The principal difference between claim 1 and claim 49 is the inclusion of a switching regulator for the regulation stage.  However, as noted above,

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

Pressman creates a strong incentive for improving efficiency by replacing the linear regulators with switching regulators. Pressman, 81.

The principal differences between claim 1 and claim 50 are (i) wherein the regulation stages are switching regulators; (ii) wherein the DC power source provides a voltage within the range of 36 to 75 volts; and (iii) wherein the regulation stage output is of a voltage level to drive logic circuitry. Again, as noted above, Pressman creates a strong incentive for improving efficiency by replacing the linear regulators with switching regulators. The voltage values are firstly known, and secondly, easily achievable with known components resulting in predictable results, as discussed above.

The principal difference between claim 1 and claim 25 is the regulation stage output is of a voltage level to drive logic circuitry. The voltage value is firstly known, and secondly, easily achievable with known components resulting in predictable results, as discussed above.

The principal difference between claim 1 and claim 29 is wherein the DC power source provides a voltage within the range of 36 to 75 volts. As discussed above, the voltage value is firstly known, and secondly, easily achievable with known components resulting in predictable results,.

The principal differences between claim 1 and claim 30 are (i) the DC power source provides a voltage within the range of 36 to 75 volts, and (ii) the regulation stage output is of a voltage level to drive logic circuitry. Again, the voltage values are firstly known, and secondly, easily achievable with known components resulting in predictable results.

16

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

We balance the secondary considerations, which do tend to somewhat support a case of nonobviousness against this strong evidence of obviousness. We are aware of our previous decisions which found this evidence to be more persuasive, albeit against a different background. We are also aware that the evidence now asserted as secondary considerations does not utilize a linear regulator. Reh'g Req. 22. On balance, although the evidence has significant weight, we conclude it is insufficient to overcome the strong case of obviousness put forth by the Requester and adopted by the Examiner.

## CONCLUSIONS

We have carefully reconsidered the evidence of record, including that of secondary considerations submitted by the Patent Owner. We also have reconsidered the evidence submitted by the Requester and the findings and conclusions of the Examiner. Finally, the most recent guidance from the Federal Circuit on the issue of the Steigerwald embodiments has been given substantial weight in our decision.

We GRANT the request and amend the decision as noted above related to correcting the claim status. We GRANT the request in that we have reconsidered the evidence of secondary considerations and modify our previous decision as noted above. However, we DENY the request in that we decline to alter our judgment.

<u>GRANTED-IN-PART</u>

17

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

Patent Owner:

Greenblum & Bernstein, P.L.C.
1950 Roland Clarke Place
Reston, VA 20191

Third Party Requester:

Turner Boyd LLP
2570 West El Camino Real
Suite 380
Mountain View, CA 94040

18



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/001,637 | 05/31/2011 | 7272021 | X43170 | 1997 |

7055          7590          05/05/2015
GREENBLUM & BERNSTEIN, P.L.C.
1950 ROLAND CLARKE PLACE
RESTON, VA 20191

| EXAMINER |
|---|
| NGUYEN, LINH M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 05/05/2015 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

VICOR CORPORATION
Requester

v.

SYNQOR, Inc.
Patent Owner and Appellant

Appeal 2014-007587
Reexamination Control 95/001,637[1]
Patent No. US 7,272,021 B2[2]
Technology Center 3900

Before JAMES T. MOORE, STEPHEN C. SIU, and
DENISE M. POTHIER, *Administrative Patent Judges*.

MOORE, *Administrative Patent Judge*.

DECISION ON APPEAL

STATEMENT OF THE CASE

Patent Owner SynQor appeals under 35 U.S.C. §§ 134(b) and 315(a)
(2002) from the rejection of claims 1, 9, 15, 16, 21–27, 29–31, 39, 45–47,

---

[1] Filed by Vicor Corporation on May 31, 2011.

[2] Issued September 18, 2007 to Martin Schlecht and Richard Farrington, and
assigned to SynQor, Inc. (the "'021 patent"). The '021 patent issued from
Application 11/407,699, filed November 23, 2006.

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

49, and 50 as set forth in the Right of Appeal Notice ("RAN") mailed May 18, 2012. Patent Owner filed an Appeal Brief August 20, 2012. Requester Vicor Corporation filed a Respondent Brief on September 20, 2012. The Examiner mailed an Examiner's Answer on February 26, 2014, which incorporated the RAN by reference and maintained all rejections. Patent Owner filed a Rebuttal Brief on March 26, 2014. Oral argument was conducted before a panel of this Board on October 15, 2014 in combined Reexamination Proceeding Appeal Numbers 2014-007362 and 2014-007587, and a transcript of the proceedings is of record. We have jurisdiction under 35 U.S.C. §§ 134 and 315.

We AFFIRM.

According to Patent Owner, U.S. Patent No. 7,564,702 was asserted in *SynQor, Inc. v. Artesyn Technologies, Inc. et al.*, Case No. 2:07-CV-497 (E.D. Tex.)("SynQor I") and in *SynQor, Inc. v. Ericson, Inc.*, Case No. 2:11-CV-00054-TJW-CE (E.D. Tex) ("SynQor II"). PO App. Br. 1. SynQor I was appealed to the Federal Circuit (Br. 1), and it appears to have been affirmed. It appears SynQor II lives on and has been severed into claims against Cisco Systems (2:14-CV-286) and claims against Vicor Corporation (2:14-CV-287) by order dated March 31, 2014, in the Eastern District of Texas.

We note that this Board was recently reversed by the United States Court of Appeals for the Federal Circuit in a related case, *Vicor Corporation v. SynQor, Inc.*, No. 2014-1578 (Fed. Cir. March 13, 2015) (nonprecedential).

2

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

To the extent the evidence relied upon during litigation and decisions of the District Courts and Federal Circuit are preclusive, persuasive or informative, we have considered them as such.

The '021 Patent concerns power conversion. The power converter system comprises a normally non-regulating isolation stage and a plurality of non-isolating regulation stages, each receiving the output of the isolation stage and regulating a regulation stage output. '021 Patent, 2:3–8.

Claim 1 is representative, and reproduced below.

> 1. A power converter system comprising:
>
> a normally non-regulating isolation stage comprising:
>
> > a primary winding circuit;
> >
> > a secondary winding circuit coupled to the primary winding circuit, the secondary winding circuit comprising a secondary transformer winding in series with a controlled rectifier having a parallel uncontrolled rectifier, the secondary winding circuit providing a normally non-regulated output of the isolation stage; and
> >
> > a control circuit which controls duty cycle of the primary winding circuit, the duty cycle causing substantially uninterrupted flow of power through the primary and secondary winding circuits during normal operation; and
>
> a plurality of non-isolating regulation stages, each receiving the non-regulated output of the isolation stage and regulating a regulation stage output.

'021 Patent 6:22–39.

3

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

## EVIDENCE OF RECORD

The Examiner relies upon the following prior art in rejecting the claims on appeal:

Steigerwald            US 5,274,539            December 28, 1993

Steigerwald            US 5,377,090            December 27, 1994

A.I. Pressman, Switching and Linear Power Supply, Power Converter Design 1–372 (1977) ("Pressman").

## THE REJECTIONS

I.  Claims 1, 9, 15, 21, 24, 26, 31, 39, 45, and 47 stand rejected under 35 U.S.C. § 102(b) as being anticipated by Steigerwald '090.

II.  Claims 22, 23, 25, and 27–30 stand rejected under 35 U.S.C. § 103(a) over Steigerwald '090 in view of the knowledge of one of ordinary skill in the art.

III. Claim 49 stands rejected under 35 U.S.C. § 103(a) over Steigerwald '090 and Pressman.

IV. Claim 50 stands rejected under 35 U.S.C. § 103(a) over Steigerwald '090, Pressman, and Admitted Prior Art.[3]

I. *The Rejection of Claims 1, 9, 15, 21, 24, 26, 31, 39, 45, and 47 under 35 U.S.C. § 102(b) as being anticipated by Steigerwald '090.*

This rejection was adopted from the Request, pages 5–21. RAN 4–5. According to the Examiner through the adoption of the rejection in the Request, Steigerwald '090 incorporates Steigerwald '539 by reference.

---

[3] Said to be contained in U.S. Patent No. 5,999,417. RAN 5.

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

Accordingly, Steigerwald '539 is considered by the Examiner to be part of the disclosure of Steigerwald '090.  Req. 6.

More specifically, Steigerwald '539 is said to describe a two stage power converter, having a regulation stage followed by an isolation stage. The isolation stage includes two transformers that operate in opposite phase, each at a complementary 50% duty cycle. "As a consequence, the energy storage capacitor $C_e$ is always transformer coupled to the dc output."  Req. 6–7, citing Steigerwald '539 3:33–38.

Steigerwald '539 is said to teach further that, in alternative embodiments, the diode rectifiers used in the isolation stage may be replaced by synchronous rectifiers.  Req. 7.

Steigerwald '090 is said to teach an extension of Steigerwald '539, in which multiple output voltages may be provided. This is said to be accomplished by replacing the single regulation stage, which in the '539 patent is upstream of the isolation stage, with multiple regulation stages that are downstream of the isolation stage. Because each regulation stage may regulate a different output voltage, multiple output voltages may be provided using only a single non-regulating isolation stage. Req. 8, citing Steigerwald '090, 2:44–50.

Steigerwald '090 contains a single figure, reproduced on the following page.

5

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2



The Figure is a circuit diagram of a power converter

The Steigerwald '090 power converter illustrates diodes as rectifiers.
The Requester asserts that Steigerwald '539 describes the use of diodes or
synchronous rectifiers as rectifiers.  Req. 9, citing Figs 4 and 8 of
Steigerwald '539, reproduced below.



*FIG. 4*

Figure 4 is a circuit diagram of a power converter using diodes

6

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2



FIG.8

Figure 8 is a circuit diagram of a power converter using controlled rectifiers

The Patent Owner takes issue with the incorporation by reference, arguing that it is insufficient to be effective.  PO App. Br. 14.   Thus, it is urged, as Steigerwald '090 does not incorporate Steigerwald '539 such that the disclosures can be treated as a single document, none of the claims are anticipated. *Id*. 20.

Patent Owner additionally observes that even assuming the Steigerwald '539 document is deemed incorporated, the alternative embodiment set up by the Examiner is drawn from separate embodiments. PO App. Br. 20.  Patent Owner also urges that the embodiment does not teach substantially uninterrupted power flow.   *Id*. at 22.

Also of interest is the Federal Circuit's recent decision in the related appeal from *inter partes* reexamination proceeding Control No. 95/001,702, noted above.  *Vicor Corporation v. SynQor, Inc.*, No. 2014-1578 (Fed. Cir. March 13, 2015) (nonprecedential).  While the decision in that case is not

7

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

precedential, it does have some persuasive value to the instant proceeding, because the cited art is largely identical.

The Court was presented with this precise issue as to whether the embodiments of the different Steigerwald references could be combined into a single embodiment as Requester and the Examiner have done here. The Federal Circuit stated that it was appropriate to do so, reversing an earlier decision of this Board in favor of SynQor. The Federal Circuit's decision is reproduced below in pertinent part:

> We therefore hold that Steigerwald '090 incorporates by reference at least those teachings of Steigerwald '539 that relate to its capacitance-multiplying converter 20. The incorporated teachings include Steigerwald '539's alternative embodiment, which teaches a substitution that takes place within the isolation stage:
>
> > In other alternative embodiments, such as those of FIGS. 7-9, synchronous rectifiers SRa and SRb are used instead of diodes CRa and CRb of FIGS. 4 and 6.
>
> Steigerwald '539 col.4 ll.58-60; *see also id.* at fig.4 (showing that diodes CRa and CRb are within the capacitance multiplying converter 20).

*Vicor Corporation v. SynQor, Inc.*, No. 2014-1578, slip op. at 10–11.

Further, the court concluded:

> We accordingly hold that the combined reference teaches substituting controlled rectifiers for diodes within the capacitance-multiplying converter 20 of both Steigerwald '539's Figure 4 and Steigerwald '090's Figure 1. The combined reference teaches a single embodiment that anticipates all elements of representative claim 20, and we reverse the Board's conclusion to the contrary.

*Id.*, slip op. at 11.

8

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

The decision is premised in part upon the description of the reference numeral 20 in Steigerwald '090. The decision notes no such numeral appears in the '090 drawings, and its inclusion was enough for a person of ordinary skill to understand that Steigerwald '090 identified the capacitance multiplying converter with reference numeral 20 in Steigerwald '539 with detailed particularity. *Id.*, slip op. at 10.

With the Federal Circuit's latest guidance in mind, we resolve the embodiment issue in favor of the Requester. *Cf. B&B Hardware v. Hargis Industries, Inc.*, 135 S.Ct. 1293 (2015)(agency decision is grounds for issue preclusion in litigation). That leaves open for resolution only the issue as to whether the embodiment would deliver substantially uninterrupted power flow raised by the Patent Owner.

According to the Patent Owner, the Steigerwald patents are specifically directed to radar applications, which are characterized by the typical pulsed load as illustrated in Steigerwald '539 Figure 2. PO App. Br. 23. It is further urged that the bias voltage is applied to reduce the threshold for power flow and does not expressly or inherently require power to flow through the converter. *Id.*

While it is true that the applications of the Steigerwald patents are for pulsed radar loads, the language of the claims broadly requires "substantially uninterrupted flow of power through the primary and secondary winding circuits during normal operation." The Requester and Examiner have observed that the converters of Steigerwald '090 have substantially uninterrupted power flow because the two transformers operate

9

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

180 degrees out of phase with a complementary 50% duty cycle  Req. 11.
We therefore are not persuaded by the Patent Owner's arguments of error.

We therefore affirm this rejection.

*II.  The rejection of Claims  22, 23, 25, and 27–30 under 35 U.S.C. §
103(a) over Steigerwald '090*

This rejection was adopted from the Request, pages 22–26.  RAN 5.
According to the Examiner, these claims recite additional features that,
although not expressly described in Steigerwald '090, add nothing of
patentable significance to claim 1. It has been found, relying upon the
declaration of Dr. Patricio Vinciarelli ("the Vinciarelli declaration"), that
these claims simply recite various known input and output voltages for the
isolation and regulation stages.  Req. 22.

The Patent Owner urges that the Examiner erred in not determining
the level of ordinary skill in the field.  PO App. Br. 24.  It is urged that the
ordinary level of skill is quite low and that this failure to determine the level
of skill undermines the rejections.  *Id.* at 25.  It is also urged that the
Examiner erred by giving weight to the Vinciarelli Declaration.

We disagree.

According to the Examiner, the voltages were in use in the telecom
and computer industries prior to the earliest claimed priority date of the '021
patent.   The Examiner has determined that a person having ordinary skill in
the art at the time of the alleged inventions of the '021 patent would have
implemented those voltages as the result of routine design choice for a
circuit for use in particular operating environments in which those voltages
are used.  *Id.*

10

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

The Vinciarelli Declaration, at paragraphs 7 through 10, for example, indicates with some specificity what a person of ordinary skill in the art would have known about power supply design and the voltages used in telecom equipment. Between the patents themselves and this testimony, we find sufficient basis to determine the information a person of ordinary skill would have known, consistent with the Examiner's findings.

The Patent Owner raises numerous additional issues in its briefing, most of which relate to evidence of secondary considerations. We agree that there is substantial evidence of secondary considerations in the record. Were the independent claims rejected as obvious, this evidence would have a substantial bearing on the ultimate determination of patentability. However, the independent claims are rejected as anticipated, upon which the determination the secondary considerations has no bearing.

The dependent claims here recite specific voltage levels or voltage levels to drive standard components. Claims 22 and 30 are exemplary and reproduced below:

> 22. A power converter system as claimed in claim 1 wherein the output of the isolation stage is about 12 volts.

> 30. A power converter system as claimed in claim 29 wherein the regulation stage output is of a voltage level to drive logic circuitry.

The Examiner has determined there is a strong case of obviousness, which has been put forth for claims directed to selecting a particular voltage level for output. We observe that the secondary considerations are principally directed to the bus architecture, for example of claim 1, although

11

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

there is some evidence in the record of a determination of direct and induced infringement of claim 30 of the '021 patent.  Ex. A20 pages 9– 27.

We therefore determine that any error which might have existed in the Examiner's consideration of the evidence of secondary considerations is harmless, as the presented evidence relates principally to features of the independent claims rejected under an anticipation rejection and does not overcome the case of obviousness for these dependent claims by providing the requisite nexus to the dependent claim features.

### III. The Rejection of Claim 49 under 35 U.S.C. § 103(a) over Steigerwald '090 and Pressman

This rejection was adopted from the Requester's comments submitted November 30, 2011, pages 18-21.  RAN 5.

Claim 49 recites a "power converter system as claimed in claim 1, wherein the regulation stages are switching regulators."

The Examiner has found that Steigerwald '090 does not expressly teach switching regulators as part of its regulating output stage. Pressman is found to describe the use of switching regulators at the output stage.   Nov. 30, 2011 Requester Comments at 18.   Motivation is said to be found in Pressman on page 81, where it states that "[i]f the larger component count of a switching postregulator (Sect.1.2) is acceptable, even higher efficiencies can be achieved." *Id.* at 20.

The Patent Owner counters that switching regulators have an inductor in the current path that is incompatible with the teaching of the Steigerwald

12

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

patents and would render the combination unsuitable for the intended use. PO App. Br. 28.

As further evidence, we are pointed generally to the testimony of Dr. Schlecht and Dr. Dickens said to be noting that the Steigerwald '090 circuit uses linear regulators, not switching regulators. *Id* at 29. However, we are not provided with specific citation. Our review of Exhibit A1 (Dr. Schlecht Declaration) fails to find support for this assertion. However, our review of Dr. Dickens' testimony in Exhibit A1D finds some level of support. Ex. A1D ¶ 27–28.

Requester counters that Patent Owner's argument is based entirely upon what Steigerwald's attorney argued during prosecution of its applications, and not on the disclosure of the Steigerwald patents. Resp. Br. 29. Requester also urges that bias voltages would not share such a restriction. *Id*. at 30. The Examiner has also observed that Steigerwald '090 uses non-pulsed loads. RAN 7.

For the capacitance multiplier converter to perform its function efficiently there is evidence in the record to support a conclusion that there must be negligible or no impedance in the path between the converter's input and the load. Dickens Decl. ¶ 10.

Steigerwald '090's sole Figure shows the schematic of the power module without any inductance shown. Claim 1 of Steigerwald '090 uses the phrase 'by a path lacking inductors' seven times (elements a, d, e, h, i, j and k), and the phrase appears four more times in claim 2 (the last four elements). Moreover, the transformer is said to have a "leakage inductance .... as low as possible because such leakage inductance, which appears as an

13

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

equivalent series inductance .... is an impedance .... causing ... a voltage drop
.... at the output." Steigerwald '539 patent, col. 3, line 65 - col. 4, line 4.
Dickens Decl. ¶ 11. A switching regulator has an inductor. Dickens Decl.
¶41.

However, Dr. Dickens also notes that Steigerwald '090 teaches away
from resistance as well. Dickens Decl. ¶23A. Yet, the Federal Circuit
determined that Steigerwald has an embodiment which includes controlled
rectifiers in the capacitance multiplying converter of Steigerwald '090 sole
Figure. *Vicor*, slip op. at 11. This determination by the Federal Circuit
weighs heavily against the Patent Owner's position.

Lastly, as noted above, the evidence of secondary considerations are
therefore unavailing for the same reasons.

Accordingly, we are unpersuaded of error.


*IV. The rejection of Claim 50 under 35 U.S.C. § 103(a) over
Steigerwald '090, Pressman, and Admitted Prior Art*

This rejection was adopted from the Requester's comments filed
November 30, 2011 at pages 21-22. RAN 5–6.

Claim 50 reads as follows:

50. A power converter system as claimed in claim 1 wherein the
regulation stages are switching regulators, wherein the DC power
source provides a voltage within the range of 36 to 75 volts, and
wherein the regulation stage output is of a voltage level to drive logic
circuitry.

14

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

The Examiner has found that the voltage levels are admitted in the specification of the 5,999,417 patent (parent to the '021 Patent) as known in the art. *Id.* at 21.

The Patent Owner asserts that this claim requires a switching regulator, and substituting switching regulators would render Steigerwald '090 unfit for its purpose. PO App Br. 68.

Also, as noted above, the evidence of record, including the embodiment introducing resistance into the secondary stage, and the secondary considerations, does not support a conclusion of error.

CONCLUSION

We have carefully considered the evidence of record, including that of secondary considerations submitted by the Patent Owner. We also have considered the evidence submitted by the Requester and the findings and conclusions of the Examiner. Finally, the most recent guidance from the Federal Circuit on the issue of the Steigerwald embodiments has been given substantial weight in our decision.

We are unpersuaded of error.

ORDER

I. The rejection of Claims 1, 9, 15, 21, 24, 26, 31, 39, 45, and 47 under 35 U.S.C. § 102(b) as being anticipated by Steigerwald '090 is affirmed.

II. The rejection of Claims 22, 23, 25, and 27–30 under 35 U.S.C. § 103(a) over Steigerwald '090 is affirmed.

15

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

III. The Rejection of Claim 49 under 35 U.S.C. § 103(a) over
Steigerwald '090 and Pressman is affirmed.

IV. The rejection of Claim 50 under 35 U.S.C. § 103(a) over
Steigerwald '090, Pressman, and Admitted Prior Art is affirmed.

<u>AFFIRMED</u>

16

Appeal 2014-007587
Reexamination Control 95/001,637
Patent No. 7,272,021 B2

PATENT OWNER:

GREENBLUM & BERNSTEIN, P.L.C.
1950 ROLAND CLARKE PLACE
RESTON, VA 20191

THIRD PARTY REQUESTER:

TURNER BOYD LLP
2570 WEST EL CAMINO REAL
SUITE 380
MOUNTAIN VIEW, CA 94040

cu

17

(12) **United States Patent**
Schlecht et al.

(10) Patent No.: **US 7,272,021 B2**
(45) Date of Patent: **\*Sep. 18, 2007**

(54) **POWER CONVERTER WITH ISOLATED AND REGULATED STAGES**

(75) Inventors: **Martin F. Schlecht**, Lexington, MA (US); **Richard W. Farrington**, Heath, TX (US)

(73) Assignee: **SynQor, Inc.**, Boxborough, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/407,699**

(22) Filed: **Apr. 20, 2006**

(65) **Prior Publication Data**

US 2006/0262575 A1    Nov. 23, 2006

**Related U.S. Application Data**

(60) Continuation-in-part of application No. 10/729,430, filed on Dec. 5, 2003, now Pat. No. 7,050,309, which is a continuation-in-part of application No. 10/812, 314, filed on Mar. 29, 2004, now Pat. No. 7,072,190, which is a continuation of application No. 10/359, 457, filed on Feb. 5, 2003, now Pat. No. 6,731,520, which is a division of application No. 09/417,867, filed on Oct. 13, 1999, now Pat. No. 6,222,742, which is a division of application No. 09/012,475, filed on Jan. 23, 1996, now Pat. No. 5,999,417, which is a continuation of application No. 09/821,655, filed on Mar. 29, 2001, now Pat. No. 6,594,159.

(60) Provisional application No. 60/431,673, filed on Dec. 6, 2002, provisional application No. 60/036,245, filed on Jan. 24, 1997.

(51) **Int. Cl.**
*H02M 3/335*    (2006.01)

(52) **U.S. Cl.** .......................... **363/17**; 363/97

(58) **Field of Classification Search** ................ 363/16, 363/18, 20, 21.01, 95, 97, 125, 131, 17
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,663,941 A    5/1972   Pasciutti

(Continued)

FOREIGN PATENT DOCUMENTS

| EP | 0 549 920 B1 | 7/1993 |
| EP | 1231705 A2 | 8/2002 |
| JP | 06315263 A | 11/1994 |
| WO | WO88/09084 A1 | 11/1988 |

OTHER PUBLICATIONS

Mweene, L. Haachitaba, et al., "A High-Efficiency 1.5 kW, 390-50 V Half-Bridge Converter Operated at 100% Duty-Ratio,"IEEE, 1992, pp. 723-730.

(Continued)

*Primary Examiner*—Adolf Berhane
(74) *Attorney, Agent, or Firm*—Hamilton, Brook, Smith & Reynolds, P.C.

(57) **ABSTRACT**

In a power converter, the duty cycle of a primary winding circuit causes near continuous flow of power through the primary and secondary winding circuits during normal operation. By providing no regulation during normal operation, a very efficient circuit is obtained with a synchronous rectifier in the secondary operating at all times. However, during certain conditions such as start up or a short-circuit, the duty cycle of the primary may be reduced to cause freewheeling periods. A normally non-regulating isolation stage may be followed by plural non-isolating regulation stages. To simplify the gate drive, the synchronous rectifiers may be allowed to turn off for a portion of the cycle when the duty cycle is reduced. A filter inductance of the secondary winding circuit is sufficient to minimize ripple during normal operation, but allows large ripple when the duty cycle is reduced. By accepting large ripple during other than normal operation, a smaller filter inductance can be used.

**48 Claims, 8 Drawing Sheets**





**US 7,272,021 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,438,411 A | 3/1984 | Rubin et al. | |
| 4,586,119 A | 4/1986 | Sutton | |
| 4,788,450 A | 11/1988 | Wagner | |
| 4,788,634 A | 11/1988 | Schlecht et al. | |
| 4,812,672 A | 3/1989 | Cowan et al. | |
| 5,019,954 A | 5/1991 | Bourgeault et al. | |
| 5,179,512 A | 1/1993 | Fisher et al. | |
| 5,274,543 A | 12/1993 | Loftus, Jr. | |
| 5,303,138 A | 4/1994 | Rozman | |
| 5,343,383 A | 8/1994 | Shinada et al. | |
| 5,396,412 A | 3/1995 | Barlage | |
| 5,442,534 A | 8/1995 | Cuk et al. | |
| 5,513,092 A | 4/1996 | Goebel | |
| 5,528,480 A | 6/1996 | Kikinis et al. | |
| 5,528,482 A | 6/1996 | Rozman | |
| 5,621,621 A | 4/1997 | Lilliestrale | |
| 5,625,541 A | 4/1997 | Rozman | |
| 5,663,887 A | 9/1997 | Warn et al. | |
| 5,726,869 A | 3/1998 | Yamashita et al. | |
| 5,771,160 A | 6/1998 | Seong | |
| 5,774,350 A | 6/1998 | Notaro et al. | |
| 5,870,299 A | 2/1999 | Rozman | |
| 5,872,705 A | 2/1999 | Loftus, Jr. et al. | |
| 5,880,949 A | 3/1999 | Melhem et al. | |
| 5,959,370 A | 9/1999 | Pardi | |
| 5,999,417 A | 12/1999 | Schlecht | |
| 6,016,258 A | 1/2000 | Jain et al. | |
| 6,046,920 A | 4/2000 | Cazabat et al. | |
| 6,066,943 A | 5/2000 | Hastings et al. | |
| 6,088,329 A | 7/2000 | Lindberg et al. | |
| 6,252,781 B1 | 6/2001 | Rinne et al. | |
| 6,487,093 B1 | 11/2002 | Vogman | |
| 6,504,267 B1 | 1/2003 | Giannopoulos | |
| 6,552,917 B1 | 4/2003 | Bourdillon | |
| 6,700,365 B2 | 3/2004 | Isham et al. | |
| 6,728,118 B1 | 4/2004 | Chen et al. | |
| 6,735,094 B2 | 5/2004 | Steigerwald et al. | |
| 6,853,568 B2 | 2/2005 | Li et al. | |
| 7,050,309 B2 * | 5/2006 | Farrington | 363/17 |
| 7,072,190 B2 | 7/2006 | Schlecht | |
| 2003/0174522 A1 | 9/2003 | Xu et al. | |
| 2005/0047177 A1 | 3/2005 | Tobita | |
| 2006/0209572 A1 | 9/2006 | Schlecht | |
| 2006/0285368 A1 | 12/2006 | Schlecht | |

## OTHER PUBLICATIONS

Mweene, Loveday Haachitaba, "The Design of Front-End DC-DC Converters of Distributed Power Supply Systems with Improved Efficiency and Stability," Thesis, Massachusetts Institute of Technology, Sep. 1992, pp. 1-184.

Casey, Leo Francis, "Circuit Design For 1-10 MHZ DC-DC Conversion," MIT Doctoral Thesis, Jan. 1989, pp. 1-216.
Ferencz, Andrew, "A 250 W High Density Point-of-Load Converter," MIT Master of Science Thesis, Sep. 1989, pp. 1-117.
Mohandes, Bijan, MOSFET Synchronous Rectifiers Achieve 90% Efficiency—Part I and Part II, PCIM, Jun. 1991, pp. 10-13 & 55-61.
Cobos, J.A., et al., "Resonant Reset Forward Topologies for Low Output Voltage On Board Converters," IEEE, 1994, pp. 703-708.
Tabisz, W.A., et al., "A MOSFET Resonant Synchronous Rectifier for High-Frequency DC/DC Converters," Proceedings of the Power Electronics Specialists Conference, San Antonio, TX, Jun. 10-15, 1990, pp. 769-779.
Wiegman, H.L.N., et al., "A Dual Active Bridge SMPS Using Synchronous Rectifiers," HFPC May 1990 Proceedings, pp. 336-346.
Shoyama, Masahito, et al., "Zero-Voltage-Switching Realized by Magnetizing Current of Transformer in Push-Pull Current-Fed DC-DC Converter," IEEE, 1993, pp. 178-184.
Shoyama, Masahito, et al., "Zero-Voltage-Switched Push-Pull DC-DC Converter," IEEE, 1991, pp. 223-229.
Xiao, Li, et al., "Soft Switched PWM DC/DC Converter With Synchronous Rectifiers," IEEE 1996, pp. 476-484.
Blanchard, Richard, et al., "The Design of a High Efficiency, Low Voltage Power Supply Using MOSFET Synchronous Rectification and Current Mode Control," IEEE, 1985, pp. 355-361.
Jitaru, Ionel Dan, et al., "High Efficiency DC-DC Converter," IEEE, 1994, pp. 638-644.
Harper, D.J., et al., "Controlled Synchronous Rectifier," HFPC May 1988 Proceedings, pp. 165-172.
Acker, Brian, et al., "Current-Controlled Synchronous Rectification," IEEE 1994, pp. 185-191.
Murakami, Naoki, et al., "A High-Efficiency 30-W Board Mounted Power Supply Module," IEEE 1991, pp. 122-127.
Casey, Leo F., et al., "A High Frequency, Low Volume, Point-of-Load Power Supply for Distributed Power Systems," IEEE 1987, pp. 439-450.
Schlecht, Martin F., "Research Results from the Study of A High Efficiency, Highly Manufacturable DC-DC Converter," unpublished, pp. 1-32.
Gachora, John Mburu, "Design of a Four-Phase Switchmode High Efficiency Power Supply," MIT Master of Engineering Thesis, 1994, pp. 1-66.
Blanchard R., et al., "MOSFETs Move In On Low Voltage Rectification," Official Proceedings of the Ninth International PCI '84 Conference, Oct. 29-31, 1984, pp. 213-222.
Garcia, O. et al., "Zero Voltage Switching In The PWM Half Bridge Topology With Complementary Control And Synchronous Rectification," Record of the Annual Power Electronics Specialist Conference, Pesc, Atlanta, Jun. 12-15, 1995, vol. 1, No. CONF. 26, Jun. 12, 1995, IEEE, pp. 286-291.

* cited by examiner

U.S. Patent    Sep. 18, 2007    Sheet 1 of 8    US 7,272,021 B2

Appx40





## FIG. 1




FIG. 2

U.S. Patent

Sep. 18, 2007

Sheet 3 of 8

US 7,272,021 B2



FIG. 4



FIG. 3

U.S. Patent          Sep. 18, 2007          Sheet 4 of 8          US 7,272,021 B2

Appx43



FIG. 4A



FIG. 4B



FIG.4C



FIG. 4D



FIG. 5

US 7,272,021 B2

1

# POWER CONVERTER WITH ISOLATED AND REGULATED STAGES

## RELATED APPLICATIONS

This application is a Continuation-in-Part of U.S. application Ser. No. 10/729,430, filed on Dec. 5, 2003 now U.S. Pat. No. 7,050,309, which claims the benefit of U.S. Provisional Application No. 60/431,673, filed Dec. 6, 2002 and a Continuation-in-Part to U.S. application Ser. No. 10/812, 314, filed Mar. 29, 2004 now U.S. Pat. No. 7,072,190, which is a continuation of application Ser. No. 10/359,457, filed Feb. 5, 2003 now U.S. Pat. No. 6,731,520, which is a continuation of application Ser. No. 09/821,655, filed Mar. 29, 2001, now U.S. Pat. No. 6,594,159, which is a divisional of application Ser. No. 09/417,867, filed Oct. 13, 1999, now U.S. Pat. No. 6,222,742, which is a divisional of Ser. No. 09/012,475, filed Jan. 23, 1998, now U.S. Pat. No. 5,999, 417, which claims the benefit of U.S. Provisional Application 60/036,245 filed Jan. 24, 1997. The entire teachings of the above applications are incorporated herein by reference.

## BACKGROUND OF THE INVENTION

This invention pertains to switching power converters. A specific example of a power converter is a DC-DC power supply that draws 100 watts of power from a 48 volt DC source and converts it to a 5 volt DC output to drive logic circuitry. The nominal values and ranges of the input and output voltages, as well as the maximum power handling capability of the converter, depend on the application.

It is common today for switching power supplies to have a switching frequency of 100 kHz or higher. Such a high switching frequency permits the capacitors, inductors, and transformers in the converter to be physically small. The reduction in the overall volume of the converter that results is desirable to the users of such supplies.

Another important attribute of a power supply is its efficiency. The higher the efficiency, the less heat that is dissipated within the supply, and the less design effort, volume, weight, and cost that must be devoted to remove this heat. A higher efficiency is therefore also desirable to the users of these supplies.

A significant fraction of the energy dissipated in a power supply is due to the on-state (or conduction) loss of the diodes used, particularly if the load and/or source voltages are low (e.g. 3.3, 5, or 12 volts). In order to reduce this conduction loss, the diodes are sometimes replaced with transistors whose on-state voltages are much smaller. These transistors, called synchronous rectifiers, are typically power MOSFETs for converters switching in the 100 kHz and higher range.

The use of transistors as synchronous rectifiers in high switching frequency converters presents several technical challenges. One is the need to provide properly timed drives to the control terminals of these transistors. This task is made more complicated when the converter provides electrical isolation between its input and output because the synchronous rectifier drives are then isolated from the drives of the main, primary side transistors. Another challenge is the need to minimize losses during the switch transitions of the synchronous rectifiers. An important portion of these switching losses is due to the need to charge and discharge the parasitic capacitances of the transistors, the parasitic inductances of interconnections, and the leakage inductance of transformer windings.

2

## SUMMARY OF THE INVENTION

In certain embodiments of the invention, a power converter system comprises a normally non-regulating isolation stage and a plurality of non-isolating regulation stages, each receiving the output of the isolation stage and regulating a regulation stage output. The non-regulating isolation stage may comprise a primary winding circuit and a secondary winding circuit coupled to the primary winding circuit. The secondary winding circuit comprises a secondary transformer winding in series with a controlled rectifier having a parallel uncontrolled rectifier. A control circuit controls duty cycle of the primary winding circuit, the duty cycle causing substantially uninterrupted control of power through the primary and secondary winding circuits during normal operation.

The duty cycle of the primary winding circuit may be reduced to cause freewheeling periods in other than normal operation. Duty cycle might be reduced during the startup or to limit current and may be a function of sensed current.

The primary winding circuit may include a single primary winding, and the secondary winding circuit may include plural secondary windings coupled to the single primary winding. The primary winding may be in a full bridge circuit having a capacitor in series with the primary winding. In one implementation of the full bridge circuit, during freewheeling, only two top FETs or two bottom FETs are turned off.

A control signal of the controlled rectifier may be derived from a waveform of the secondary winding circuit. The secondary winding circuit may include a filter inductor and have a capacitor coupled across its output.

The isolation stage may be a step down stage. For example, it may provide an output of about 12 volts from a DC power source that provides a voltage varying over the range of 36–75 volts. The regulation stages may be down converters to provide outputs of voltage levels to drive logic circuitry. A regulation stage output may, for example, be 5 volts or less, such as 3.3 volts.

## BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing and other objects, features and advantages of the invention will be apparent from the following more particular description of preferred embodiments of the invention, as illustrated in the accompanying drawings in which like reference characters refer to the same parts throughout the different views. The drawings are not necessarily to scale, emphasis instead being placed upon illustrating the principles of the invention.

FIG. 1 shows a full-bridge, single-transformer, voltage-fed isolation stage that incorporates concepts of the '417 patent.

FIG. 2 illustrates the addition of a capacitor to the primary winding of FIG. 1.

FIG. 3 illustrates the addition of an output filter inductor to the circuit of FIG. 2.

FIGS. 4A–4C show a control circuit for the circuits of FIGS. 1–3 and embodying the present invention, and FIG. 4D shows an alternative to the circuit of FIG. 4B.

FIG. 5 shows an Intermediate Bus Architecture (IBA) implementation of the invention.

US 7,272,021 B2

<table>
<tr><td>3</td><td>4</td></tr>
</table>

### DETAILED DESCRIPTION OF THE INVENTION

A description of preferred embodiments of the invention follows.

FIG. 1 shows a full-bridge, single-transformer, voltage-fed isolation stage that incorporates synchronous rectification and the concepts of the '417 patent. The operation of this isolation stage is as follows. For the first half of the cycle, MOSFETs 101 and 103 are turned on while MOS-FETs 102 and 104 are left off, and the voltage $V_B$ is applied positively (according to the "dot" convention) across the transformer's primary winding 107. This voltage, modified by the transformer's turns-ratio, appears across the secondary windings with the appropriate polarity. Power flows into the transformer's primary winding, and out of the first secondary winding 108 to the output. The voltage at Node B is approximately twice the output voltage, and it causes the MOSFET synchronous rectifier 105 to be turned on. The voltage at Node A is therefore slightly below ground, which causes the MOSFET synchronous rectifier 106 to be turned off. These states of the rectifier switches are consistent with the power flowing out of the first secondary winding.

During the second half of the cycle, MOSFETs 102 and 104 are turned on while MOSFETs 101 and 103 are left off, and the voltage $V_B$ is applied negatively across the transformer's primary winding. This negative polarity causes MOSFET 106 to be turned on, MOSFET 105 to be turned off, and power to flow into the primary winding and out of the second secondary winding 109 to the output across capacitor 110.

The secondary windings are not tightly coupled to each other, as indicated with the parasitic inductances 113 and 114, to achieve the advantages discussed in the '417 patent. A similar setup was shown in the topology of FIG. 9 of the '417 patent since it also used a single transformer.

Care must be taken in this isolation stage topology to insure that the magnetizing inductance of the transformer does not saturate. One way to do this is to place a large capacitor 215 in series with the primary winding, as shown in FIG. 2. This capacitor will assume a dc voltage across it that counters any imbalance there may be in the positive and negative volt-seconds of the waveforms created by MOS-FETs 101–104. Alternatively, several well-known techniques to sense the magnetizing inductor's current could be used to modify the durations of the first and second halves of the cycle.

The filters at the output of the isolation stages in the '417 patent are composed of one or more capacitive and inductive elements. When the isolation stage is voltage-fed, it may be desirable to have the output filter begin with an inductor 316, as shown in FIG. 3. One benefit this approach provides is that the voltage-fed isolation stages can now be operated with a variable duty cycle control strategy to provide a soft-start capability or to limit current flow in a short-circuit condition. These functions could be provided by the regulation stages in the topologies depicted in the '417 patent, but if the isolation stage is not combined directly with a regulation stage in a single product, then it may be desirable to include these functional capabilities in the isolation stage, as well.

Under variable duty cycle control, the percentage of the overall cycle (the duty cycle) that MOSFETs 101 and 103 (or MOSFETs 102 and 104) conduct is reduced from the 50% value described above. For the remaining, freewheeling fraction of the half-cycle, either all of the primary-side MOSFETs are turned off, or at least the two top MOSFETs 101 and 104 or the two bottom MOSFETs 102 and 103 are turned off. During the freewheeling part of the cycle, both diodes 111 and 112 conduct the current flowing through inductor 316, and the voltage across the transformer windings is approximately zero. As is well know, this additional portion of the cycle permits the output voltage to be less than $V_B$ divided by the transformer's turns-ratio. How much less depends on the duty cycle. Since during normal operation the isolation stage is operated at a fixed duty cycle in which power is always flowing from input to output (except during the brief switch transitions), the value of inductor 316 can be relatively small to achieve an acceptable output ripple. This reduces the size, cost, and power dissipation of this inductor compared to what it might have been. During those times when the isolation stage is operated under a variable duty cycle, the ripple in the inductor current may then become large, but the larger output voltage ripple that results can usually be tolerated for start-up and short-circuit conditions.

As mentioned above, during the freewheeling part of the cycle the diodes are carrying the inductor current. This is because the gate drive scheme shown in FIG. 3 would cause the MOSFET synchronous rectifiers to be off during this part of the cycle. The additional power dissipation that occurs due to the higher on-state voltage of the diodes compared to that of the MOSFETs can usually be tolerated for the start-up and short-circuit conditions because they are normally short in duration.

If the output voltage is high, then it may be desirable to use a capacitive divider technique described in the '417 patent to reduce the voltages applied to the gates of the MOSFET synchronous rectifiers below that of the voltages appearing at Nodes A and B. FIGS. 4A–4C show a circuit schematic of a product based, in part, on the ideas presented here and in the '417 patent. The function of the product is to provide isolation and a transformation of the input voltage to the output voltage according to the turns-ratio of the transformer. It does not, in its normal state of operation, provide regulation. As such it is a very efficient product. One example of its use is to convert a 48V input to a 12V output by using a turns-ratio of 4:1. Since there is no regulation, if the input voltage varies +/−10%, so too will the output voltage vary +/−10%. In certain applications, this variation in the output is acceptable, and well worth the very high efficiency of the converter, which is 96% in this example.

In addition, since the converter of FIG. 4 does not provide regulation, its output voltage demonstrates a droop characteristic. By this it is meant that for any given input voltage, the output voltage drops slightly as the output current increases. For instance, the output voltage may drop 5% as the output current varies from 0% to 100% of the rated maximum value. This droop characteristic provides automatic current sharing between two or more such converters that might be place in parallel.

Note in this schematic that the IC labeled U100 is a pulse width modulator (PWM) control chip that is normally operated such that the gate drive signals that pass through gate drivers U101 and U105 give the fixed duty cycle operation of the full-bridge described above. If the current sensing amplifier U104-A senses that the current flowing on the primary side of the circuit exceeds a threshold value, it commands the PWM control chip to reduce its duty cycle by an amount determined by how large the current gets above the threshold value. This provides a current limiting scheme for the product that protects against a short-circuit condition.

Note also that comparator U106-A senses the duty cycle output of the PWM control chip, and compares it to a threshold. If the duty cycle falls below this threshold value,

US 7,272,021 B2

5
6

the output of the comparator causes the PWM control IC to shut down. The circuitry around this comparator, including transistors Q111 and Q114, provides a latching mechanism such that the PWM control IC remains off once this condition is observed.

As described in the '417 patent and illustrated in FIG. 5, in some situations, it may be desirable to place the isolation stage first in the power flow, and to have the regulation stage follow. For example, when there are many outputs sharing the total power, the circuit might be configured as one isolation/step-down (or step-up) stage 501 followed by several DC-DC switching or linear regulators 503.

The DC power source to the full bridge primary circuit may provide a voltage that varies over the range of 36–75 volts. The output of the isolation stage may be 12 volts, and the regulation stage output may be 5 volts or less. In particular, the regulation stage output may be 3.3 volts. Typically, the regulation stage output is of a voltage level to drive logic circuitry.

Because the isolation stage uses synchronous rectifiers, it is possible for the current to flow from the output back to the input if, for a given input voltage and duty cycle, the output voltage is too high. This condition might, for example, occur during start-up where the duty cycle is slowly raised from its minimum value to its maximum value, but the output capacitor is already pre-charged to a high voltage, perhaps because it had not fully discharged from a previous on-state condition. It might also occur when the input voltage suddenly decreases while the output voltage remains high due to the capacitors connected to this node.

The negative current that results could cause destructive behavior in the converter or in the system if it is not kept small enough.

One way to avoid this condition is to turn off either just the top two primary-side MOSFETs 101 and 104, or just the bottom two primary-side MOSFETs 102 and 103, during the freewheeling period, as described above. By leaving the other two primary-side MOSFETs on, the voltage across the primary and secondary windings of the transformer is guaranteed to be essentially zero during the freewheeling period. Given the gate drive scheme shown in FIG. 3, this, in turn, ensures the controlled rectifiers will be off during this part of the cycle.

With the controlled rectifiers off, negative current cannot flow during the freewheeling period. Negative current can flow during the non-freewheeling part of the cycle, but since it must always start at zero, its value is limited to the ripple that the inductor permits, which is typically small enough to not cause a problem. This negative current will be reset to zero at the start of each freewheeling period, either by providing a clamp circuit, as shown in FIG. 4D, or by allowing the controlled rectifiers to avalanche and act as their own clamp. Since the clamp circuit must only work for a short duration, it need not recover its absorbed energy and so can be simple, such as the one shown in FIG. 4D.

To limit the negative current, the isolation stage could operate in a reduced duty-cycle mode. While the control circuit is typically designed to achieve this mode during start-up and shutdown of the isolation stage, it is not the normal mode of operation. If, during normal operation, the input voltage drops suddenly, a large negative current can flow because there are no freewheeling periods.

To avoid this condition, the current flowing through the converter can be sensed, either by sensing the load current directly, or by sensing a signal indicative of the load current. When the load current falls below some threshold, the duty cycle of the isolation stage can be reduced from its maxi-

mum value to provide freewheeling periods. Given the drive scheme for the primary-side MOSFETs outlined above, the negative current will then be kept small since the controlled rectifiers will be turned off for a portion of the cycle.

While this invention has been particularly shown and described with references to preferred embodiments thereof, it will be understood by those skilled in the art that various changes in form and details may be made therein without departing from the scope of the invention encompassed by the appended claims. For example, whereas the Figures show the secondary side rectification circuit arranged in a center tapped configuration with two secondary windings and two synchronous rectifiers, as is well known it could be a full wave rectification configuration. One could use a full-bridge rectification circuit in which there is only one secondary winding and four synchronous rectifiers. Such a circuit reduces voltage stress on the synchronous rectifiers when they are off by a factor of two during normal operation of the converter.

What is claimed is:

1. A power converter system comprising:
a normally non-regulating isolation stage comprising:
a primary winding circuit;
a secondary winding circuit coupled to the primary winding circuit, the secondary winding circuit comprising a secondary transformer winding in series with a controlled rectifier having a parallel uncontrolled rectifier, the secondary winding circuit providing a normally non-regulated output of the isolation stage; and
a control circuit which controls duty cycle of the primary winding circuit, the duty cycle causing substantially uninterrupted flow of power through the primary and secondary winding circuits during normal operation; and
a plurality of non-isolating regulation stages, each receiving the non-regulated output of the isolation stage and regulating a regulation stage output.

2. A power converter system as claimed in claim 1 wherein the duty cycle of the primary winding circuit is reduced to cause freewheeling periods in other than normal operation.

3. A power converter system as claimed in claim 2 wherein the controlled rectifiers are caused to be off during a portion of each cycle when the duty cycle is reduced.

4. A power converter system as claimed in claim 3 wherein the duty cycle is a function of sensed current.

5. A power converter system as claimed in claim 4 wherein the duty cycle is reduced to limit current.

6. A power converter system as claimed in claim 2 wherein the duty cycle is reduced during start up.

7. A power converter system as claimed in claim 2 wherein the duty cycle is a function of sensed current.

8. A power converter system as claimed in claim 7 wherein the duty cycle is reduced to limit current.

9. A power converter system as claimed in claim 1 wherein the secondary winding circuit comprises plural secondary transformer windings.

10. A power converter system as claimed in claim 1 wherein the primary winding circuit includes a single primary winding and the secondary winding circuit includes two secondary windings coupled to the single primary winding.

11. A power converter system as claimed in claim 10 wherein the primary winding is in a full bridge circuit.

US 7,272,021 B2

7

**12.** A power converter system as claimed in claim **11**, further comprising a capacitor in series with the primary winding.

**13.** A power converter as claimed in claim **11** wherein, during freewheeling, only two top FETs of the full bridge current are turned off.

**14.** A power converter as claimed in claim **11** wherein, during freewheeling, only two bottom FETs of the full bridge current are turned off.

**15.** A power converter system as claimed in claim **1** further comprising a capacitor coupled across an output of the secondary winding circuit.

**16.** A power converter system as claimed in claim **1** wherein a control signal of the controlled rectifier is derived from a waveform of the secondary winding circuit.

**17.** The power converter system as claimed in claim **1** further comprising a filter inductance of the secondary winding circuit that is sufficient to minimize ripple during normal operation but allows large ripple when the duty cycle is reduced.

**18.** A power converter system as claimed in claim **1** further comprising a capacitor in series with a primary winding in the primary winding circuit.

**19.** A power converter system as claimed in claim **1** further comprising a filter inductor in the secondary winding circuit.

**20.** A power converter system as claimed in claim **19** wherein the filter inductor is sufficient to minimize ripple during normal operation but allows large ripple when the duty cycle is reduced.

**21.** A power converter system as claimed in claim **1** wherein the regulation stages are down converters.

**22.** A power converter system as claimed in claim **1** wherein the output of the isolation stage is about 12 volts.

**23.** A power converter system as claimed in claim **22** wherein the regulation stage output is of a voltage level to drive logic circuitry.

**24.** A power converter system as claimed in claim **1** wherein the isolation stage is a step down stage.

**25.** A power converter system as claimed in claim **1** wherein the regulation stage output is of a voltage level to drive logic circuitry.

**26.** A power converter system as claimed in claim **1** wherein the regulation stage output is about 5 volts or less.

**27.** A power converter system as claimed in claim **1** wherein the regulation stage output is about 3.3 volts.

**28.** A power converter system as claimed in claim **1** wherein the DC power source provides a voltage that varies over the range of 36 to 75 volts.

**29.** A power converter system as claimed in claim **1** wherein the DC power source provides a voltage within the range of 36 to 75 volts.

**30.** A power converter system as claimed in claim **29** wherein the regulation stage output is of a voltage level to drive logic circuitry.

**31.** A method of converting power comprising:
providing an isolated output normally without regulation by:
    providing power to primary and secondary transformer windings, there being a controlled rectifier having a parallel uncontrolled rectifier in series with the secondary transformer winding; and

8

controlling duty cycle of the power to the primary winding, the duty cycle causing substantially uninterrupted flow of power through the primary and secondary windings during normal operation; and
from the isolated output, providing plural regulated outputs without further isolation.

**32.** A method as claimed in claim **31** wherein the duty cycle of the primary winding circuit is reduced to cause freewheeling periods in other than normal operation.

**33.** A method as claimed in claim **32** wherein the controlled rectifiers are caused to be off during a portion of each cycle when the duty cycle is reduced.

**34.** A method as claimed in claim **32** wherein the duty cycle is a function of sensed current.

**35.** A method as claimed in claim **34** wherein the duty cycle is reduced to limit current.

**36.** A method as claimed in claim **32** wherein the duty cycle is reduced during start up.

**37.** A method as claimed in claim **32** wherein the duty cycle is a function of sensed current.

**38.** A method as claimed in claim **37** wherein the duty cycle is reduced to limit current.

**39.** A method as claimed in claim **31** wherein the power is applied to plural secondary windings.

**40.** A method as claimed in claim **31** wherein power is applied through a single primary winding and two secondary windings coupled to the single primary winding.

**41.** A method as claimed in claim **40** wherein the primary winding is in a full-bridge circuit.

**42.** A method as claimed in claim **41** wherein, during freewheeling, only two top FETs of the full bridge current are turned off.

**43.** A method as claimed in claim **41** wherein, during freewheeling, only two bottom FETs of the full bridge current are turned off.

**44.** A method as claimed in claim **41** wherein a capacitor is in series with the primary winding.

**45.** A method as claimed in claim **31** wherein the isolated output is applied to a capacitor.

**46.** A method as claimed in claim **31** wherein a control signal of the controlled rectifier is derived from a waveform of the secondary winding circuit.

**47.** A power converter system comprising:
primary and secondary transformer windings, there being a controlled rectifier having a parallel uncontrolled rectifier in series with the secondary transformer winding;
means for controlling duty cycle of the power to the primary winding, the duty cycle causing substantially uninterrupted flow of power through the primary and secondary windings during normal operation to provide an isolated output without regulation; and
means for providing plural regulated outputs, without further isolation, from the isolated output.

**48.** A system as claimed in claim **47** further comprising means for reducing the duty cycle of the primary winding circuit to cause freewheeling periods in other than normal operation.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.       : 7,272,021 B2                      Page 1 of 1
APPLICATION NO. : 11/407699
DATED            : September 18, 2007
INVENTOR(S)     : Martin F. Schlecht and Richard W. Farrington

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

<u>On the Title page at Title (54) and Col. 1, line 1</u>
Please delete "Regulated" and insert --Regulation--.

Signed and Sealed this

Twenty-seventh Day of November, 2007

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 7,272,021 B2                                                Page 1 of 2
APPLICATION NO. : 11/407699
DATED                   : September 18, 2007
INVENTOR(S)       : Martin F. Schlecht and Richard W. Farrington

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the front page at Related U.S. Application Data (60)

Please delete paragraph at (60): "Continuation-in-part of application No. 10/729,430, filed on Dec. 5, 2003, now Pat. No. 7,050,309, which is a continuation-in-part of application No. 10/812,314, filed on Mar. 29, 2004, now Pat. No. 7,072,190, which is a continuation of application No. 10/359,457, filed on Feb. 5, 2003, now Pat. No. 6,731,520, which is a division of application No. 09/417,867, filed on Oct. 13, 1999, now Pat. No. 6,222,742, which is a division of application No. 09/012,475, filed on Jan. 23, 1996, now Pat. No. 5,999,417, which is a continuation of application No. 09/821,655, filed on Mar. 29, 2001, now Pat. No. 6,594,159."

Insert new paragraph at (60) --Continuation-in-Part of U.S. Application No. 10/729,430, filed on December 5, 2003, and a Continuation-in-Part to U.S. Application No. 10/812,314, filed March 29, 2004, which is a continuation of Application No. 10/359,457, filed February 5, 2003, which is a continuation of Application No. 09/821,655, filed March 29, 2001, now U.S. patent 6,594,159, which is a divisional of Application No. 09/417,867, filed October 13, 1999, now U.S. patent 6,222,742, which

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 7,272,021 B2                                    Page 2 of 2
APPLICATION NO. : 11/407699
DATED               : September 18, 2007
INVENTOR(S)      : Martin F. Schlecht and Richard W. Farrington

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

is a divisional of 09/012,475, filed January 23, 1998, now U.S. patent 5,999,417.--

Signed and Sealed this

Twenty Second Day of April, 2008

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 7,272,021 C1                                              Page 1 of 1
APPLICATION NO.   : 95/001206
DATED                : September 4, 2014
INVENTOR(S)        : Martin F. Schlecht et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title page of the above-referenced U.S. Reexamination Certificate in item (73) Assignee section, please delete "Bank of America, N.A." and insert -- SynQor, Inc. --

Signed and Sealed this
Eleventh Day of November, 2014

*Michelle K. Lee*

Michelle K. Lee
*Deputy Director of the United States Patent and Trademark Office*

US007272021C1

(12) **INTER PARTES REEXAMINATION CERTIFICATE** (954th)
**United States Patent**
Schlecht et al.

(10) **Number:**          **US 7,272,021 C1**
(45) **Certificate Issued:**          *Sep. 4, 2014

(54) **POWER CONVERTER WITH ISOLATED AND REGULATION STAGES**

(75) Inventors: **Martin F. Schlecht**, Lexington, MA (US); **Richard W. Farrington**, Heath, TX (US)

(73) Assignee: **Bank America, N.A.**, New York, NY (US)

**Reexamination Request:**
No. 95/001,206, Aug. 19, 2009

**Reexamination Certificate for:**
Patent No.:     **7,272,021**
Issued:          **Sep. 18, 2007**
Appl. No.:      **11/407,699**
Filed:           **Apr. 20, 2006**

Certificate of Correction issued Nov. 27, 2007
Certificate of Correction issued Apr. 22, 2008

( * ) Notice:     This patent is subject to a terminal disclaimer.

**Related U.S. Application Data**

(60) Continuation-in-part of application No. 10/729,430, filed on Dec. 5, 2003, now Pat. No. 7,050,309, which is a continuation-in-part of application No. 10/812,314, filed on Mar. 29, 2004, now Pat. No. 7,072,190, which is a continuation of application No. 10/359,457, filed on Feb. 5, 2003, now Pat. No. 6,731,520, which is a continuation of application No. 09/821,655, filed on Mar. 29, 2001, now Pat. No. 6,594,159, which is a division of application No. 09/417,867, filed on Oct. 13, 1999, now Pat. No. 6,222,742, which is a division of application No. 09/012,475, filed on Jan. 23, 1998, now Pat. No. 5,999,417.

(60) Provisional application No. 60/431,673, filed on Dec. 6, 2002, provisional application No. 60/036,245, filed on Jan. 24, 1997.

(51) **Int. Cl.**
*H02M 3/335*          (2006.01)
(52) **U.S. Cl.**
USPC  ..............................................  **363/17**; 363/97
(58) **Field of Classification Search**
None
See application file for complete search history.

(56)          **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 95/001,206, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Linh M. Nguyen

(57)          **ABSTRACT**

In a power converter, the duty cycle of a primary winding circuit causes near continuous flow of power through the primary and secondary winding circuits during normal operation. By providing no regulation during normal operation, a very efficient circuit is obtained with a synchronous rectifier in the secondary operating at all times. However, during certain conditions such as start up or a short-circuit, the duty cycle of the primary may be reduced to cause freewheeling periods. A normally non-regulating isolation stage may be followed by plural non-isolating regulation stages. To simplify the gate drive, the synchronous rectifiers may be allowed to turn off for a portion of the cycle when the duty cycle is reduced. A filter inductance of the secondary winding circuit is sufficient to minimize ripple during normal operation, but allows large ripple when the duty cycle is reduced. By accepting large ripple during other than normal operation, a smaller filter inductance can be used.





US 7,272,021 C1

**1**

# INTER PARTES
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 316

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **1**, **9**, **15**, **16**, **21-27**, **29-31**, **39** and **45-47** is confirmed.

Claims **2-8**, **10-14**, **17-20**, **28**, **32-38**, **40-44** and **48** were not reexamined.

\* \* \* \* \*

**2**

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2016, a true and correct copy of the foregoing was timely filed with the Clerk of the Court using the appellate CM/ECF system, which will send notifications to all counsel registered to receive electronic notices.

/s/ Thomas D. Rein
Thomas D. Rein
*Counsel for Appellant SynQor, Inc.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and the Rules of this Court, because it contains 13,857 words as determined by the Microsoft 2007 word-processing system used to prepare the brief, excluding the parties of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using the Microsoft Word 2007 word-processing system in 14-point Times New Roman font.

/s/ Thomas D. Rein
Thomas D. Rein